**SANO PETROLEUM CORPORATION,**
Plaintiff,

v.

**AMERICAN OIL COMPANY, Defendant.**
Civ. No. 14173.

United States District Court
E. D. New York.

Sept. 13, 1960.

Silberman & Steinfeld, Brooklyn, N. Y., for plaintiff; Raphael H. Weissman, Brooklyn, N. Y., of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendant, J. Howard Carter, Andrew L. Hughes, and Walter E. Shuttleworth, New York City, of counsel.

ZAVATT, District Judge.

This is an action for damages brought by Sano Petroleum Corp. ("Sano"), a former wholesale distributor of gasoline,[1] against American Oil Co. ("Ameri-

1. Sano was dissolved on July 22, 1957, approximately three years after this action was commenced on February 5, 1954.

can"), a refiner of gasoline and one of the "major oil companies" whose activities are nation-wide. The complaint is grounded upon section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13, and section 4 of the Act, 15 U.S.C.A. § 15, which are quoted elsewhere in this opinion. In substance, the plaintiff alleges in its complaint that price discriminations practiced by American were such as to substantially lessen competition and tended to create a monopoly and tended to destroy, injure and prevent competition, and that the plaintiff was injured in its business and property within the meaning of the Robinson-Patman Act. However, at the trial and in its post-trial memorandum, the plaintiff stresses injury, destruction or prevention of competition rather than creation of a monopoly or substantial lessening of competition. The complaint prays for treble damages in the sum of $1,500,000 but, in the plaintiff's post-trial memorandum, the alleged normal damages have been reduced to a total of $48,329.48 which, trebled, amounts to $144,988.44. The plaintiff also seeks reasonable attorneys' fees to be fixed by the court. The defendant denies the material allegations of the complaint and asserts a counterclaim for the sum of $2,084.44 with interest from April 15, 1954 as the unpaid balance for goods sold or delivered by the defendant to the plaintiff. The plaintiff admits that the defendant is entitled to recover on its counterclaim.

In order to appreciate the facts it is necessary to have a picture of how American markets its gasoline and the part that Sano played therein.[2] American's gasoline comes mainly by ocean tanker from the producing fields of the Southwest and arrives at American's terminal in Carteret, New Jersey, from which it is barged to various bulk plants which serve as distribution points for particular localities. For example, American's bulk plant in the Greenpoint section of Brooklyn services the whole of Long Island as well as the southern part of Manhattan. American markets its gasoline from these bulk plants in two different ways. Firstly, it markets through distributors, each having its own tank trucks and its own territory, who receive gasoline at an American bulk plant and resell it to dealers and commercial consumers in their respective territories. In the industry a distributor is one who purchases gasoline from a supplier, such as American, and resells the same either to a dealer or to a consumer; a dealer is one who purchases gasoline either directly from a supplier such as American, or through a distributor, such as Sano, and resells it to the ultimate consumer; a consumer is one who purchases gasoline either from a supplier or a distributor or a dealer for his own use and not for resale. Secondly, it sells directly to some large commercial consumers. As to such sales, American generally hired an agent to transport its gasoline, in trucks owned by the agent, to the place of business of these customers.[3] Thus, American's general pattern of marketing (which appears to be the general pattern in the industry) is supplier—distributor—dealer—consumer, with the pattern short-circuited in the case of large consumers, to whom American sells directly. The pattern just outlined is not rigid and there is nothing to prevent a supplier, such as American, from selling directly to a retail dealer.[4] Nor is there anything in the abstract that prevents a distributor, such as Sano, or even a retail

2. American sells two grades of gasoline in the New York area. Only the regular grade, sold under the trade name "American", is involved in this suit.

3. During the period in question, American did not have tank trucks of its own in which to make such deliveries.

4. Although the complaint alleges that the plaintiff distributes its gasoline to gasoline service stations owned by others and to gasoline service stations owned, operated or maintained by it, this was not established at the trial and such sales do not form any part of the basis of the plaintiff's alleged damages.

dealer, from selling to large commercial consumers.

In the distribution of American's gasoline, Sano served a dual function. Beginning in 1936, Sano acted as a wholesale distributor, buying gasoline from American and reselling it to its own customers in its "non-exclusive" territory of Brooklyn and Queens. In addition, Sano served as a cartage agent of American, delivering gasoline in behalf of American to American's own large commercial consumer accounts in the Brooklyn-Queens-Nassau area. Sano contends that the discriminatory prices, on which it grounds its complaint, were charged during the period from April 10, 1948 to April 10, 1953. During this period, hereinafter called "the period in question", there was in effect a contract between Sano and American under which Sano agreed to buy from American and American agreed to sell to Sano all of Sano's requirements of gasoline for resale. Sano's customers were, in the main, service stations or dealers who sold American gasoline at retail, although Sano did have some consumer accounts. The contract limited Sano's resale of American gasoline to the territory of Brooklyn and Queens. In fact, however, Sano had a few customers outside of this area. Sano's right to sell American gasoline in the Brooklyn-Queens area was not exclusive, i. e. the contract did not prevent American from selling to other distributors in the Brooklyn-Queens area or from selling directly to its own customers in that area. During the period in question American did not sell to other distributors for resale in the Brooklyn-Queens area but it did sell directly to its own accounts in that area. In the main, it is because of direct sales by American to its own accounts in this area that plaintiff seeks damages. In the distribution of its gasoline throughout other Boroughs of New York City and the rest of the Metropolitan area, American followed a similar pattern of non-exclusive distributors and cartage agents. One of these distributors picked up gasoline at American's bulk plant in Brooklyn, to a limited extent and for a limited period of time, for resale outside the area. Others picked up gasoline from American's bulk plants in Mount Vernon, New York and elsewhere and sold it to its customers outside of the area.

By the terms of the distributorship contract, the quantities of gasoline to be sold by American to Sano to fulfill its entire requirements for resale to customers of Sano was specified to be the quantities that Sano needed for resale to customers whose names were set forth in a schedule attached to the contract. If Sano wanted to add a new customer, it was required to obtain approval of American. During the period in question Sano added forty new customers. There was no evidence at the trial as to whether American ever disapproved a potential customer whose name was submitted to it by Sano. At the trial it appeared that, whenever Sano dropped a customer it served written notice upon American and that, during the period in question, it so dropped thirty-four of its named customers. There was no evidence that any customer of Sano ever became a customer of American, or vice versa, during the period in question. Although the contract did not specifically require Sano to solicit new customers, such a requirement may be fairly inferred from the provision of the contract which required Sano to use reasonable efforts to increase the sale of American products in the Brooklyn-Queens area.

The contract did not establish a fixed selling price. Rather, it provided a formula for determining the selling price by reference to a fluctuating price known as the "posted tank wagon price". This tank wagon price is the price at which American suggests its purchasers should sell American gasoline to their retail dealers. During the period in question, the price to Sano was this tank wagon price less a discount fluctuating between 2.5 cents and 3 cents per gallon and Sano purchased a total of 15,091,107 gallons of "American" brand of the defendant's gasoline.

American's price to other distributors in other parts of the Metropolitan area was similarly determined. However, the discount given and therefore the net price to all distributors throughout the entire Metropolitan area was not the same. The only sales to other distributors on which the plaintiff bases any part of its claim to damages were those by American to the distributor Uneeda Gas and Oil Corp ("Uneeda"). Uneeda was American's non-exclusive distributor in the northern Manhattan-Bronx area and maintained its own bulk plant in Mount Vernon, New York. It bought American gasoline at American's terminal in Carteret, New Jersey, and transported the same in its own barges to its bulk plant. It received the same distributor's discount from the posted tank wagon price as that granted to Sano. But, in addition, Uneeda was granted an additional discount of ½ cent per gallon for picking up the gasoline in its own barges and delivering it to its own bulk plant. Sano does not claim that this added discount is not cost justified. However, from April 10, 1948 to December 31, 1949, Uneeda picked up daily at American's Brooklyn bulk plant one truckload (1,500 to 1,920 gallons) of gasoline on which it was granted the same additional discount of ½ cent per gallon that it received on the gasoline that it barged from Carteret, New Jersey. During this period Uneeda purchased from American a total of 3,747,706 gallons of "American" brand gasoline of which 259,440 gallons were picked up at American's Brooklyn plant. The additional discount allocable to the gasoline picked up at the Brooklyn plant amounted to $1,297.20. None of the gasoline purchased by Uneeda from American was resold in the Brooklyn-Queens area. All of it was sold in Uneeda's non-exclusive area in the northern Manhattan-Bronx area. There

is no proof that Sano sold "American" brand gasoline in Uneeda's area. During this period Sano purchased from American 5,200,379 gallons of "American" brand gasoline.

American's price to its large commercial consumers in the Brooklyn-Queens area was also at a discount from the posted tank wagon price.[5] The discount differential (between the discount granted to Sano and the discount granted to large commercial consumer accounts of American) as to which Sano complains are the discounts granted by American to Metropolitan Distributors, Inc. ("Metropolitan") and Swift & Co. ("Swift"). As to sales to Metropolitan, Sano complains of price discrimination during the period January 1, 1950 to April 10, 1953. However, since Sano computes its damages on the basis of the number of gallons that it bought from American rather than the number of gallons that American sold to any alleged favored buyer and since it complains of discounts granted to Swift from January 19, 1953, the court, in order to prevent a duplication of alleged damages, construes Sano's complaint with reference to the sales to Metropolitan to cover the period January 1, 1950 to and including January 18, 1953. During this period Metropolitan purchased from American approximately 6,000,000 gallons of "American" brand of gasoline and Sano purchased approximately 9,000,000 gallons of the same brand of gasoline.

Metropolitan was a truck rental concern.[6] The price at which it leased its trucks to its customers included gasoline and service. If one of its lessees bought gasoline elsewhere (as it had a right to do) instead of having it supplied by Metropolitan, Metropolitan credited it for the gallonage so purchased on the basis of Metropolitan's cost of gasoline

---

**5.** Strictly speaking, a discount was given from the "commercial consumer tank wagon price". For the period in question these two prices were substantially the same.

**6.** Sometime prior to the trial Metropolitan was absorbed by the Hertz Car Rental Company.

rather than the retail price which the lessee paid at some retail gasoline station.[7] Metropolitan never resold any of its gasoline to dealers or others, unless the terms of its truck-rental leases must be deemed to constitute a sale of gasoline to these lessees. During the period in question American was not the only major oil company supplying gasoline to Metropolitan. It was a price conscious company and shopped around for the most favorable terms. It had its own tank trucks and pursuant to the terms of the contract with American took delivery of "American" brand gasoline at American's bulk plant in Brooklyn where title to the gasoline passed. The normal discount from the posted tank wagon price allowed to Metropolitan differed from that allowed to Sano as follows:

| Period | Metropolitan | Sano |
|---|---|---|
| 1–1–50 to 4–24–50 | 1.75 cents | 2.5 cents |
| 4–25–50 | 1.75 " | 3.0 " |
| 4–26–50 to 9–14–50 | 1.75 " | 2.5 " |
| 9–15–50 to 5–12–52 | 1.75 " | 2.6 " |
| 5–13–52 to 6–30–52 | 1.85 " | 2.6 " |
| 7–1–52 to 1–18–53 | 1.90 " | 2.6 " |

However, by a separate contract dated three days later than the contract to purchase, Metropolitan was paid 1 cent per gallon "cartage" for picking up its own gasoline at the Brooklyn bulk plant of American whereas Sano (which likewise picked up its own gasoline at the same bulk plant) was given no such allowance. Under the terms of the contracts to sell between American and Metropolitan and American and Sano "delivery" was completed and title passed at American's bulk plant. The cartage contract between American and Metropolitan[8] was not what it purported to be. The court construes the contract to sell and the cartage contract between American and Metropolitan as one transaction and to constitute a discount allowance to Metropolitan greater than that granted to Sano.

Metropolitan paid less per gallon as follows:

| Period | Metropolitan's Differential |
|---|---|
| 1–1–50 to 4–24–50 | .25 cents |
| 4–25–50 | (.25 cents) |
| 4–26–50 to 9–14–50 | .25 cents |
| 9–15–50 to 5–12–52 | .15 " |
| 5–13–52 to 6–30–52 | .25 " |
| 7–1–52 to 1–18–53 | .30 " |

Sano also complains of price discrimination by American in its direct sales of gasoline to Swift, a meat packer with several plants in the Metropolitan area. As to these sales the period involved is January 19, 1953 through April 10, 1953. American sold its "American" brand of gasoline to Swift at the normal discount of 2 cents. During this period American

7. It was not developed on the trial whether the credit was based on the normal discount price which Metropolitan paid to American or whether Metropolitan's cost took into consideration the additional 1 cent per gallon which American allowed to it. This additional discount price is discussed later.

8. Later this cartage contract was superseded by one with identical terms between American and a wholly-owned subsidiary of Metropolitan.

sold the same brand of gasoline to Sano at a discount of 2.6 cents. However, although Sano picked up its purchases of gasoline at American's bulk plant in Brooklyn, American delivered the gasoline purchased by Swift to its plants within the Brooklyn-Queens area. These deliveries were made by various cartage agents of American, including Sano, at a cost to American of 1.1 cents per gallon. Thus, American made ½ cent per gallon less on its sales to Swift than on its sales to Sano, and Sano claims this ½ cent as a discrimination in price against it. There is no evidence as to the number of gallons of gasoline so sold by American to Swift. During this period, however, American sold to Sano 609,910 gallons of "American" brand gasoline. There is no evidence that Swift resold any of the gasoline which it purchased from American or that customers of Sano are in competition (actual or potential) with either Swift or Swift's customers.

Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a) provides:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States * * * and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided*, That nothing contained [herein] shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: * * * *And provided further*, That nothing contained [herein] shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: * * *."

Section 4 of the Act, 15 U.S.C.A. § 15, provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

█ The parties are in agreement and the evidence supports the conclusion that American is a person engaged in commerce; that, in the course of such commerce, it sold gasoline of like grade and quality to the different purchasers hereinabove described at different prices; that all of the sales and purchases were in commerce; that the gasoline so sold was sold for use, consumption, or resale within the United States. Standard Oil Co. v. FTC, 1950, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239.

### The Statute of Limitations

██ The defendant has pleaded the New York State three year statute of limitations as a partial defense contending that the plaintiff may not recover for any alleged acts committed prior to February 24, 1951. This suit was instituted February 24, 1954. At that time 15 U.S. C.A. § 15b, specifying the time within which suits under section 4 of the Clayton Act, 15 U.S.C.A. § 15, must be commenced, had not been enacted. Therefore, the appropriate New York State statute of limitations governs. It has been held that a suit such as this is not

to recover a penalty or forfeiture but rather to recover upon a liability created by statute and that, therefore, the New York State six year statute of limitations, N.Y.Civ.Prac.Act, § 48, subd. 2, rather than the three year statute, N.Y.Civ.Prac. Act, § 49, subd. 3, governs. Bertha Bldg. Corp. v. National Theatres Corp., 2 Cir., 1959, 269 F.2d 785. It follows, therefore, that Sano's recovery, if any, is limited to acts of American committed within six years rather than three years of the date of the commencement of this suit and that the period in question falls within those six years.

### Legislative History

The Clayton Act of 1914 was a price discrimination act. It was aimed primarily at correcting the "common and widespread unfair trade practice" whereby a seller cut his prices in the market areas where he had competition from other sellers while maintaining his prices where he had no such competition. See H.R.Rep. No. 627, 63d Cong., 2d Sess. 1960 (1914). The Act proscribed such practices where the effect might be the creation of monopoly in the seller or the substantial lessening of competition between the seller and his competitors. It also had application to price discriminations that had an anti-competitive effect between the favored and disfavored buyers of a discriminating seller. George Van Camp & Sons Co. v. American Can Co., 1929, 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 31. The Act did not reach discriminations in price based on quantity of the commodity sold even though the discount bore no relation to the quantity and the effect of the discrimination might be to substantially lessen competition between the buyers receiving the quantity or volume discount and those not receiving it. Edwards, The Price Discrimination Law 7 (1959).

Large buyers, especially chain stores, were not the creatures of this lapse in the law but, rather, of a complex of economic and social conditions, factors, and forces. However, the chains once spawned had easier swimming. By the early 1930's:

"local price cutting to obtain a monopoly, such as Congress had had in mind in 1914, had ceased to be a major political problem. New problems had come to the fore because of great changes that were taking place in the channels of distribution. The traditional sale of goods from manufacturer to wholesaler to retailer was being challenged or superseded by new methods. Manufacturers established retail outlets. Wholesaling and retailing functions were joined by vertical integration. Chain store selling grew rapidly; mail-order distribution became more prominent; voluntary organizations of retail stores undertook wholesaling functions * * *. In the general scrambling of relationships, established groups felt their interests threatened, newcomers maneuvered for advantage, and traditional norms of business methods, markups, and business ethics were no longer reliable."

Id. at 8–9. Out of this upheaval came the Robinson-Patman Act.

The Robinson-Patman Act made several important changes in the existing law, three of which are pertinent. Firstly, the requisite effect on competition, upon which to found a violation, was reduced from substantial lessening of competition or tending toward creation of monopoly, to injury to, or destruction or prevention of, competition. The shift in emphasis is said to be from injury to the market to injury to the competitor. See H.R.Rep. 2287, 74th Cong., 2d Sess., 3–8 (1936). Secondly, under the new law it became a violation if the requisite anti-competitive effect were felt at the level where buyers from buyers of the discriminating seller compete. See Krug v. Int'l Tel. & Tel. Corp., D.C.D.N.J. 1956, 142 F.Supp. 230, 235. Thus a tertiary line was added to the already existing primary (sellers') line and secondary (buyers') line. Lastly, quantity discounts were made a matter of defense to the extent that the discount was justified by savings in cost to the seller. For

the purpose of the Robinson-Patman amendment to section 2 was to limit the use of quantity price differentials to the sphere of actual cost differences. H.R. Rep. No. 2287, 74th Cong., 2d Sess. 9 (1936); F. T. C. v. Morton Salt Co., 1948, 334 U.S. 37, 43, 68 S.Ct. 822, 827, 92 L.Ed. 1196.

Although the new test of injury to competition is equally applicable to the sellers' level as it is to the buyers' level (and to that extent sellers' discriminatory practices have been further curbed), the Robinson-Patman Act was enacted primarily "to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." See F. T. C. v. Henry Broch & Co., 1960, 363 U.S. 166, 80 S. Ct. 1158, 1160, 4 L.Ed.2d 1124. Large retailers tend to displace wholesalers and to the extent that large retailers were meant to be curbed wholesalers were meant to be protected. The Robinson-Patman Act is an effort "to preserve traditional marketing channels, [manufacturer-wholesaler-retailer], against the encroachment of mass distributors and chains." Rowe, The Evolution of the Robinson-Patman Act: A Twenty-Year Perspective, 57 Colum.L.Rev. 1059, 1061 (1957). Against this backdrop, the claims of Sano are to be assessed.

A price discrimination within the meaning of section 2(a) is merely a price difference. F. T. C. v. Anheuser-Busch, Inc., 1960, 363 U.S. 536, 80 S. Ct. 1267, 4 L.Ed.2d 1385. But not all discriminations or differences in price are proscribed by section 2(a). In addition to the jurisdictional requirements as to "commerce", it must be reasonably probable that the effect of such discrimination may be (1) substantially to lessen competition or (2) to tend to create a monopoly in any line of commerce or (3) to injure, destroy or prevent competition with the seller or with the favored buyer or with the customers of the favored buyer. Edwards, The Price Discrimination Law 519, n. 1 (1959). Upon such a showing, the Federal Trade Commission would succeed in an application to restrain discriminations in price. But one who seeks damages under section 4 can prevail only to the extent that he has been injured by "anything forbidden" in section 2(a). In this Circuit, proof of discrimination in price establishes a prima facie case that the discrimination is one proscribed by section 2(a) so as to shift to the defendant the burden of proving that the discrimination is not proscribed. This is the interpretation in this Circuit[9] of sections 2(a) and 2 (b)[10] Samuel H. Moss, Inc., v. F. T. C., 2 Cir., 1945. 148 F.2d 378; Enterprise Industries v. Texas Co., 2 Cir., 1957, 240 F.2d 457. But there is no presumption that the proscribed discrimination in price has caused damage to the plaintiff. The burden of proving such damage is always on the plaintiff. Enterprise Industries v. Texas Co., supra.

### Sano and American

On the other hand, equality in price charged to different purchasers by the same seller is without the ban of

**9.** Although this interpretation differs from that of the Ninth Circuit, Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 1955, 231 F.2d 356, certiorari denied, 1956, 350 U.S. 991, 76 S.Ct. 545, 100 L. Ed. 856, and has been criticized, Austin, Price Discrimination 91–92 (2d rev. ed. 1959), this court must adhere to Moss and Enterprise, infra.

**10.** 15 U.S.C.A. § 13(b):
"Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in

price or services or facilities furnished, the burden of rebutting the prima facie case thus made by showing justification shall be upon the person charged with violation of this section * * *: Provided, however, that nothing contained [herein] shall prevent a seller rebutting the prima facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

section 2(a) and an injury to competition caused by such equality cannot serve to bring the conduct within the section. Klein v. Lionel Corp., D.C.Del., 138 F. Supp. 560, affirmed on other grounds, 3 Cir., 1956, 237 F.2d 13. In that case the plaintiff was a retailer who bought from a distributor customer of the defendant manufacturer. The defendant had been selling direct to certain large retailers at the same price that it sold to distributors who resold to small retailers like the plaintiff. The plaintiff contended that the manufacturer should be required to sell to distributors at a lesser price than that charged direct buying retailers so that small retailers would be able to compete with the large retailers who bought direct. In granting summary judgment for the defendant the court said:

"It is difficult to see, however, how the conclusion contended for would not result in a flagrant violation of the Robinson-Patman Act and accomplish precisely that which the Act was intended to prevent, viz., a discrimination in price between two purchasers from the same seller."

138 F.Supp. at page 565. In 1958, two years after this decision, legislation was introduced in Congress that would have made mandatory the kind of discount structure sought by the plaintiff in *Klein*. The bills were not passed. See 60 Colum.L.Rev. 402, 403 n. 1 (1960).

The more recent case of Secatore's, Inc. v. Esso Standard Oil Co., D. C.D.Mass.1959, 171 F.Supp. 665 goes further than *Klein* and holds that a supplier may discriminate in price between a retail customer and a consumer customer, giving a lower price to the latter, where the retailer would not have been able to compete with the supplier for the business of that consumer customer were he to have been afforded equal price treatment. In *Klein*, the plaintiff was complaining of injury to competition at the tertiary level (he was a buyer from a buyer from the supplier). In *Secatore's*, the plaintiff was complaining of injury to competition at the primary level (it bought directly from the supplier for resale, just as a distributor buys directly from a supplier for resale, and claimed to be a competitor of the supplier for consumer accounts, just as Sano does). The court disposed of *Secatore's* grievance (171 F. Supp. 667) as follows:

"Clearly there would be no discrimination if defendant sold to these ultimate consumers at the same price at which it sells to plaintiff. But even then plaintiff could not compete with defendant for their business for it would as a matter of practical economics have to charge them more than it paid defendant for the gasoline in order to cover its expenses of operation, to say nothing of making a profit on the transaction. If plaintiff cannot successfully compete with defendant for these customers when there is no price differential, it is not harmed by any further reduction which defendant may make in the price it charges to them. Jarrett v. Pittsburgh Plate Glass Co., 5 Cir., 131 F.2d 674, 676; A. J. Goodman & Son, Inc. v. United Lacquer Mfg. Corporation, D.C., 81 F.Supp. 890, 893. Defendant is under no obligation to sell to plaintiff at a lower price than it charges to consumers who buy directly from it in order to enable plaintiff to compete with it for the business of those customers. But unless it does this, plaintiff will never be able to compete successfully with defendant, at least with respect to price."

The gist of *Secatore's* is that if equality cannot help, discrimination cannot injure. One of the questions to be decided in the instant case is whether the rationale of *Secatore's* is applicable. The same rationale controlled the decision in Jarrett v. Pittsburgh Plate Glass Co., 5 Cir., 1942, 131 F.2d 674, a primary line section 2(a) case; A. J. Goodman & Sons, Inc. v. United Lacquer Mfg. Corp., D.C.D.Mass.1949, 81 F.Supp. 890,

a primary line section 3 of the Robinson-Patman Act case, 15 U.S.C.A. § 13a; Chicago Sugar Co. v. American Sugar Ref. Co., 7 Cir., 1949, 176 F.2d 1, certiorari denied 1950, 338 U.S. 948, 70 S. Ct. 486, 94 L.Ed. 584, probably a section 2(e) case. See also Austin, Price Discrimination 48 (2d rev.ed. 1959); Rowe, Discriminatory Sales of Commodities in Commerce, 67 Yale L.J. 1155, 1158–59 n. 18 (1958). But cf. Adelman, Effective Competition and the Antitrust Laws, 61 Harv.L.Rev. 1289 (1948) (discussing this question from the standpoint of economic theory rather than from the standpoint of Robinson-Patman law). The rationale of *Secatore's* is premised upon the proposition that, as a matter of practical economics a supplier has a competitive advantage.

There may be situations where equality in price would not necessarily foreclose competition, actual or potential. Where price is not the sole determining factor of a sale; where a buyer will pay a little more to *A* than to *B* for the same commodity because of convenience, service or other intangibles, it may be that the rationale of *Secatore's* could be questioned. I find, however, that gasoline is a standardized commodity; that the gasoline business is extremely competitive; that large commercial customers will pay no more for one refiner's grade than for the comparable grade of another. Thus, if one (be he distributor or retailer) cannot compete in price for the business of large consumer accounts he cannot compete. Cf. Chicago Sugar Co. v. American Sugar Ref. Co., supra at page 3 of 176 F.2d.

There remains to be discussed the case of Krug v. Int'l Tel. & Tel. Corp., supra, upon which Sano places great reliance. Before the court in the *Krug* case was the defendant's motion to dismiss the complaint. The complaint alleged that the defendant supplier sold to a large retailer at a lower price than it sold to the plaintiff distributor. Thus, there was the discrimination lacking in *Klein*. However, the argument of the plaintiff in *Krug* was essentially that made in *Klein*: retailer customers of the distributor were at a competitive disadvantage vis-a-vis the direct buying (and favored) retailer. The court denied the defendant's motion. The full application of the *Secatore's* rationale at first blush seems to require the opposite result, and if so, the cases are inconsistent. But several comments are pertinent. Firstly, the proposition of "practical economics" that controlled *Secatore's* was not at all discussed in *Krug* and, presumably, was not raised by the defendant, perhaps because *Krug* was decided before *Secatore's*. Secondly, *Krug* involved buyers on the tertiary line who competed for the trade of individual consumers: the man and woman who want a radio or other home appliance. To such buyers considerations of convenience and service often play a large part in determining where they will shop and this is precisely one situation where the *Secatore's* rationale may not be appropriate. I do not consider *Krug* and *Secatore's* to be inconsistent nor do I consider Krug to be binding upon this court or controlling upon the facts in the instant case.

### Sano and Uneeda

■ Though the evidence establishes a discrimination in price favorable to Uneeda, a distributor, and therefore constitutes, in this Circuit, a prima facie case as to the anti-competitive effect thereof, the court finds, on all of the evidence [11] that this discrimination did not affect or tend to affect competition between Sano and Uneeda or between their respective retail customers and finds, further, that it did not have or tend to have any of the other proscribed effects. Cf. Anheuser-Busch, Inc. v. F. T. C., 7 Cir., 1959, 265 F.2d 677, reversed on other grounds 1960, 363 U.S. 536, 80

---

11. No issue was raised as to the validity of the contracts whereby American allocated the Brooklyn-Queens area to Sano and the northern Manhattan-Bronx area to Uneeda. These contracts would appear to be valid. Boro Hall Corp. v. General Motors Corp., 2 Cir., 1942, 124 F.2d 822.

S.Ct. 1267, 4 L.Ed.2d 1385; Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 1955, 231 F.2d 356, certiorari denied, 1956, 350 U.S. 991, 76 S.Ct. 545, 100 L. Ed. 856.

## Sano and Swift

The discrimination in price as between Sano and Swift was in favor of Sano by %10ths of a cent per gallon.[12] It complains that American paid 1.1 cents per gallon for delivery service and argues that it was entitled to a greater price discrimination than it received. "[T]he dealer obviously cannot challenge a nominal price 'discrimination' in *his favor* by demanding a bigger one." Rowe, Discriminatory Sales of Commodities in Commerce, 67 Yale L.J. 1155, 1158–59, n. 18 (1958) (emphasis in original). There was, however, a difference in service in favor of Swift, in that Swift's purchases of gasoline were delivered to its designated tanks at the expense of American whereas Sano's purchases were delivered to Sano at American's bulk plant and Sano had to deliver the same to its customers at its own expense. Is this difference in service proscribed? Section 2 (e) of the Act provides:

"It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity *bought for resale* * * * by contracting to furnish or furnishing * * * any services or facilities connected with the * * * handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms." (Emphasis added.)

Swift did not buy gasoline for resale and, therefore, the added service is not one within section 2(e).

## Sano and Metropolitan

There is authority for the proposition that, on the buying level (for example,

Sano, Metropolitan, Uneeda and Swift, as buyers from American), there must be some relationship between the buyers that entitles them to equality. Such a relationship would exist if they are competitors. In many cases arising under section 2(a), there is dictum—strong dictum—to the effect that to entitle purchasers to equality there must be, as between them, a relationship of direct competition. See F. T. C. v. Morton Salt Co., supra; F. T. C. v. Anheuser-Busch, Inc., 7 Cir., 1959, 265 F.2d 677, 681, reversed on other grounds 1960, 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed. 2d 1385; Balian Ice Cream Co. v. Arden Farms Co., supra; Chicago Sugar Co. v. American Sugar Refining Co., supra; Alexander v. Texas Co., D.C.W.D.La. 1958, 165 F.Supp. 53, 56; see also 45 Cornell L.Q. 560, 564 (1960).

The *Krug* case exemplifies one instance where this dictum is too strict. In that case a complaint was upheld that alleged that the customers of the disfavored buyer competed with the favored buyer. In an attempt to bring itself within this exception Sano contends that such a relationship exists here; that its retail service station customers compete with Metropolitan for the business of Metropolitan's lessees. It is certainly true that if Metropolitan did not provide gasoline to its lessees, the lessees would have to buy gasoline from somewhere and by the laws of probability some would end up at gas stations serviced by Sano. It is also true that the arrangement that in fact existed (gasoline supplied as part of rental and only a wholesale credit for gasoline bought by the lessee at retail) made it improbable that lessees would buy at any retail station, much less one serviced by Sano. In fact, the evidence indicated that the lessees were required to bring the trucks to Metropolitan's garages daily for servicing and that they used gasoline furnished by Metropolitan except on rare occasions. As to whether,

---

12. "It may be safely stated * * * that the term 'price' as used in the * * * Act means the total actual price paid by the buyer to the seller for the delivered

goods, regardless of place or manner of delivery" Austin, op. cit. supra note 9 at 24.

under the arrangement between Metropolitan and its lessees, Metropolitan must be deemed to have purchased gasoline from American for resale, the order of the FTC in Shell Oil Co., Docket No. 6698 (April 2, 1958) is worthy of note. There, two cab associations purchased gasoline from Shell and "sold" it to their members. The cease and desist order excluded such "sales" in the following language:

"The terms 'resold' and 'resale', as used in this order, shall not include sales to an affiliate of a buyer from respondent Shell Oil Company solely for use by such affiliate, or sales by an organization for use in vehicles identified by its trade name, such as sales by a co-operatively-owned taxicab company of such products for use in the taxicabs of its members."

I conclude that Metropolitan's rental arrangement with its lessees did not contemplate or constitute sales of gasoline. Thus the factual analogy to *Krug* fails for even there the favored buyer resold. Furthermore, although retail stations, including Sano's retail customers, may have been foreclosed from selling gasoline to Metropolitan's lessees it was Metropolitan's rental arrangement, rather than the price discrimination afforded Metropolitan by American, that foreclosed the market.

On the facts found and the theories advanced I hold that American has not violated section 2(a) for the reason that discriminations in price (and the prices to Uneeda and Metropolitan were discriminatory vis-a-vis Sano) did not substantially lessen competition or tend to create a monopoly or to injure, destroy or prevent competition. But even if the evidence required a finding that these discriminations in price did have one or more of these proscribed effects, Sano still could not prevail because there is no evidence as to injury to it. Sano failed to sustain its burden of proving damages.

Enterprise Industries v. Texas Co., supra, 240 F.2d at page 460.

It thus becomes unnecessary to discuss Sano's theory for computing the dollar equivalence of an injury, in the legal sense, that I have found does not exist. Nevertheless, the theory is so novel that it deserves some mention. Sano argues that the measure of damages in this kind of case is the difference in price to it and another buyer, multiplied by the number of gallons *bought by Sano* during the period that the particular difference prevailed. To show an application is to refute the theory. From April 10, 1948 to December 31, 1949, Uneeda bought 239,-440 gallons of gasoline from American on which it paid ½ cent per gallon less than Sano. During this same period Sano bought 5,200,379 gallons. Thus, on a transaction that conferred a $1,297.20 benefit on Uneeda, Sano finds an untrebled injury of $26,001.90. There is nothing in law or logic, including the dictum in Bruce's Juices, Inc. v. American Can Co., 1947, 330 U.S. 743, 757, 67 S.Ct. 1015, 1021, 91 L.Ed. 1219, upon which Sano relies so heavily, that supports such a ridiculous result. In *Bruce's Juices* the Court merely said, "If the prices are illegally discriminatory, petitioner has been damaged, in the absence of extraordinary circumstances, at least in the amount of that discrimination." On the facts just outlined, recovery of $1,297.20 would be perfectly consistent with that formulation, and that amount trebled is the most that Sano could recover had it proven that it did suffer any injury because of the price discrimination in favor of Uneeda.

This opinion constitutes the court's Findings of Fact and Conclusions of Law. Settle an order awarding judgment in favor of the defendant against the plaintiff and judgment on the counterclaim in favor of the defendant, and against the plaintiff in the sum of $2,-084.44, with interest from April 15, 1954, together with costs.