461 F.Supp. 350 (1978)
UNIROYAL, INC., Plaintiff,
v.
JETCO AUTO SERVICE, INC., Irving Gellar and Marvin Gellar, Defendants.
JETCO AUTO SERVICE, INC., Plaintiff-by-Counterclaim,
v.
INTER-CITY TIRE AND AUTO CENTERS, INC. and Uniroyal, Inc., Defendants-by-Counterclaim.
No. 75 Civ. 921 (JMC).
United States District Court, S. D. New York.
August 23, 1978.
*351 *352 Arthur, Dry & Kalish by Walter Barthold, Gayle S. Sanders, New York City, for plaintiff.
Pollack & Kaminsky by Daniel A. Pollack, Martin I. Kaminsky, New York City, for defendants.

OPINION
CANNELLA, District Judge:
After a bench trial on the issue of plaintiff's liability to Jetco Auto Service, Inc. ["Jetco"] on the latter's counterclaims, the Court finds that Jetco may recover damages for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 340 of the New York General Business Law and for common law breach of contract. The other counterclaims are dismissed for failure of proof.[1]
This Court has jurisdiction pursuant to 15 U.S.C. § 15, 28 U.S.C. §§ 1331, 1337 and the doctrine of pendent jurisdiction.

THE FACTS
Plaintiff Uniroyal, Inc. ["Uniroyal"] is a corporation engaged, inter alia, in the manufacture and sale of automotive tires and tubes in interstate and foreign commerce. Defendant-counterclaimant Jetco is a multi-service center for automobiles deriving its principal revenues from the sale of tires. Defendant Marvin Gellar is the president of Jetco, succeeding his father Irving Gellar as head of the family-owned business. Jetco is located on Route 9 in Dutchess County, New York.
Jetco began selling Uniroyal tires in the mid-1960's and became a Uniroyal franchise dealer in 1968. Beginning in 1970, Jetco's tire business progressively increased and, in 1972, Uniroyal issued Jetco a franchise for a particular line of tires, called the Zeta Charter. (Jetco's Exhibit 9, hereinafter "JX" 9). Under the terms of the Zeta Charter, Uniroyal agreed not to "deliver Zeta tires to any other retail or wholesale establishment" within the Charter area. Jetco's Charter area was designated as the City and Township of Poughkeepsie. By its terms, the Zeta Charter agreement was valid from March 7, 1972, until December 31, 1973, unless sooner terminated by either party on thirty days written notice.
*353 In February of 1973, the Uniroyal sales representative whose territory included Jetco, Edward G. Donnelly, informed Marvin Gellar ["Gellar"] that Uniroyal was granting a dealership to a tire outlet called InterCity Tire and Auto Centers, Inc. ["Intercity"] to be located also along Route 9, just six miles south of Jetco, in Wappingers Falls, Dutchess County. The close proximity of the two dealerships put them in direct competition.
Intercity, like Jetco, was a family-owned corporation engaged in automotive services similar to those rendered by Jetco. Its president, Daniel Ginsberg, had prior ties to Uniroyal, having opened a Uniroyal dealership in Shrub Oak, New York in March of 1972 and, at an earlier period, having sold Uniroyal tires in New York City. Daniel's brother, Stanley Ginsberg, was also a Uniroyal dealer.
Marvin Gellar expressed his concern to Donnelly about loss of sales to Intercity's Wappingers Falls store but was assured that Jetco would be treated equally with Intercity and that there was enough business for all. After an unexpected delay, caused by the roof's collapse during construction, Intercity's Wappingers Falls store opened in October 1973 and was then issued a Uniroyal Zeta Charter. Intercity's Zeta Charter area included part of the Township of Poughkeepsie, since its northern boundary was the City of Poughkeepsie.
Mr. Donnelly's assurances to Gellar proved ineffectual. Uniroyal granted Intercity special discounts, allowances and other services, in violation of its own policies and regulations, that were neither offered nor available to Jetco. Moreover, Intercity's "Grand Opening" advertisements offered a special on "blem" tires[2] that Jetco also had requested but had been unable to obtain.
In order to compete effectively with Intercity, Jetco reduced its prices and commenced open competitive advertising with Intercity. Jetco and Intercity advertised the same tires and services in the same newspapers, sometimes on adjacent pages. The advertisements were directed at the same persons throughout Dutchess County because both dealerships sought customers from the same geographic area.
Seeing Jetco's prices fall below those of Intercity, Daniel Ginsberg complained to Donnelly. Donelly assured Ginsberg that nobody was getting better prices on tires than Intercity. According to Robert Sullen, manager of Intercity's Wappingers Falls store, Donnelly told him he had spoken to Marvin Gellar about the low prices and also had brought the information to the attention of Uniroyal's district sales manager F. G. Sears. Except for the Zeta tire prices, Jetco kept its prices below those of Intercity.
In November of 1973, Donnelly and Sears visited Jetco to discuss the Intercity-Jetco situation. According to Gellar, Sears threatened him with product shortages and loss of dealership unless Jetco raised its prices. Shortly thereafter, Donnelly visited Gellar just after leaving Intercity's Wappingers Falls store. Donnelly told Gellar that Intercity would raise its prices one dollar if Jetco agreed to raise its prices two dollars.
When nothing came of this last incident, Donnelly's regular visits to Jetco ceased until late January 1974. It was at that time that Gellar was advised of Uniroyal's decision to terminate Jetco as a Uniroyal dealer. When asked the reason for such action, Donnelly mentioned "customer complaints" but was unable to give Gellar any details. Gellar had never been advised of customer complaints serious or numerous enough to cause the termination of his dealership and had not been given the opportunity to cure or disprove these purported complaints.
Gellar immediately telephoned Sears hoping Uniroyal would reconsider its decision. *354 Sensing that the Intercity-Jetco price was the actual reason for Jetco's termination, Gellar offered to meet with Daniel Ginsberg to try to work something out. Sears indicated that it was too late. Gellar followed up his telephone call with a mailgram to Sears, again pleading for a change of heart on Uniroyal's part. Sears responded by letter that the decision to terminate Jetco still stood and that the cancellation papers were being prepared.
Uniroyal instituted suit in this Court against Jetco for goods sold and delivered amounting to $23,342.48. In the Pretrial Order, dated February 10, 1978, Jetco acknowledged its indebtedness to Uniroyal of this sum.[3] Uniroyal also sued Irving and Marvin Gellar as guarantors of Jetco's obligations. Jetco counterclaimed for damages, based upon violations of Sherman Act § 1, 15 U.S.C. § 1, Robinson-Patman Act § 2(a), (d), (e), 15 U.S.C. § 13(a), (d), (e), the Donnelly Act, N. Y. Gen. Business Law § 340, and common law wrongs, and impleaded Intercity alleging a conspiracy with Uniroyal in violation of state and federal antitrust laws. On May 4, 1977, Jetco discontinued its counterclaims as to Intercity only. In March 1978, the issues involving Uniroyal's liability to Jetco on the counterclaims were tried to the Court.

DISCUSSION
The Court has determined that Jetco may recover treble damages for Uniroyal's violation of Sherman Act § 1, 15 U.S.C. § 15, and may recover damages on its Donnelly Act claim and its breach of contract claim. Jetco may not recover for Uniroyal's violations of the Robinson-Patman Act due to a failure in proof of the fact of injury causally connected to the alleged wrongs.

The Sherman Act § 1 Claim
Congress has declared illegal "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce . . .." 15 U.S.C. § 1. Section 4 of the Clayton Act provides a private right of action with recovery of treble damages for "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . .." 15 U.S.C. § 15.
The Court finds that Uniroyal violated Sherman Act § 1 when, in response to complaints from Intercity, Uniroyal threatened Jetco to raise its prices and then made good on its threats by terminating Jetco's dealership. Jetco may recover treble damages under Clayton Act § 4 because it proved damage to its business caused by loss of the Uniroyal franchise.
The evidence of interaction among Uniroyal, Jetco and Intercity is largely uncontradicted. Uniroyal admits that Daniel Ginsberg and Robert Sullen complained about Jetco's prices to Sears and Donnelly following the opening of the Wappingers Falls store and that, thereafter, Sears and Donnelly discussed Jetco's prices with Gellar. Uniroyal denies it ever asked Jetco to raise its prices, threatened Jetco with termination if it failed to do so or, finally, terminated the franchise for this reason. Uniroyal claims, instead, that the decision to stop dealing with Jetco was based upon customer complaints.
At trial, Sears denied asking Gellar to raise Jetco's prices when he visited Jetco in November 1973. At the same time, however, Sears testified that "the point of my raising the fact that he [Gellar] was running rather low prices is indicative of the fact that I thought maybe he might do something about it." (Trial transcript at 583-84, hereinafter "Tr." 583-84). This was consistent with Sears' stated concern that the low prices at which Jetco was advertising Uniroyal's Zeta tires would hurt Uniroyal's "image."
Marvin Gellar's recollection of the November 1973 visit was more elaborate:
Mr. Sears told me that he was bothered about the prices I was charging for Uniroyal tires. He also told me he was bothered about the price competition that developed between Intercity and myself.
. . . . .

*355 [He told me he was bothered about] ... the low price I had on these tires and the fact that Mr. Ginsberg, of Intercity, complained [to him].
. . . . .
He told me that ... he saw no reason that we could not raise our prices together ... and just draw what customers would come to each establishment.
. . . . .
He told me he had a very large district, ... that the Intercity store had spent a lot of money coming to the area and he did not need any aggravation from me and if I didn't raise my prices and get this situation solved immediately, he would take drastic measures.
. . . . .
He told me that he was a district manager, he had a lot of power, and we were coming to a chemical shortage where tires would be in short supply ..., that he could see where tires would not be shipped, and he also stated to me I had a franchise and it could be terminated.
(Tr. at 254-55). One month earlier, Donnelly had spoken to Gellar about Jetco's prices and warned him of trouble with the front office.
Gellar did not raise Jetco's prices and, in January 1974, the decision was made to terminate the Jetco franchise. Uniroyal labels this decision a unilateral determination made for a proper business purpose. The Court disagrees. Uniroyal's attempts to pressure Jetco into raising its prices, after receiving complaints from Intercity, and to work out the $1 Intercity/ $2 Jetco deal were not actions taken unilaterally. The "unilateral" shield protects no more than the mere announcement of pricing policy and the refusal to deal if such policy is not followed. Bowen v. New York News, Inc., 366 F.Supp. 651, 668 n.38 (S.D.N.Y. 1973) (Bauman, J.), aff'd in part, rev'd in part, 522 F.2d 1242 (2d Cir. 1975), cert. denied, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); see United States v. Parke, Davis & Co., 362 U.S. 29, 37, 43, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).
Similarly, the Court rejects Uniroyal's argument that the decision to terminate Jetco's franchise was made for a lawful purpose. The evidence of "customer complaints" against Jetco was flimsy at best. The source of one such complaint, a Mr. Rinaldi, stated in a letter that he allowed Intercity to register a complaint in his name in exchange for Intercity's promise of free tires. The purported complaint was that Jetco had overcharged Rinaldi for "blems," but Jetco offered proof that Rinaldi had paid a discounted price for his tires. Moreover, Daniel Ginsberg stated that nobody ever complained to him about Jetco.
Uniroyal's "customer complaint" defense was further undermined by the testimony of Uniroyal district service manager Joseph Fields. When questioned as to the general procedure used in handling customer complaints, Fields responded that Uniroyal would contact the dealer complained about, either immediately or shortly thereafter. Despite this general practice, and juxtaposed against evidence that complaints concerning other dealers were investigated, Uniroyal produced no credible evidence that Gellar was ever notified about complaints against Jetco and failed to resolve them  even though, according to Uniroyal, the numerosity of such complaints caused Uniroyal to terminate the Jetco franchise. Although Fields testified that Uniroyal received more than the usual number of complaints against Jetco, this was not something that either began or increased dramatically at or about the time Uniroyal decided to stop dealing with Jetco.
Even were the Court to credit Uniroyal's evidence regarding customer complaints against Jetco, Sears admitted that the decision to terminate Jetco's dealership was also caused by Jetco's low prices. Because Uniroyal's "illegal motive substantially contributed to such decision," Phillips v. Crown Central Petroleum Corp., 395 F.Supp. 735, 769 (D.Md.1975), Uniroyal's "customer complaint" defense fails.
Uniroyal's second major argument against liability to Jetco under Section 1 of *356 the Sherman Act concerns Jetco's burden of proving some damage flowing from the assertedly violative conduct. For it is wellsettled that:
In order to recover in a private antitrust action under § 4 of the Clayton Act, 15 U.S.C. § 15, plaintiffs must establish a causal connection between the alleged antitrust violation and some injury to them. This fact of legal injury must be established with certainty, although at this stage the precise amount of damages may remain somewhat speculative.
Jacobi v. Bache & Co., Inc., 377 F.Supp. 86, 93 (S.D.N.Y.1974) (Ward, J.), aff'd, 520 F.2d 1231 (2d Cir. 1975), cert. denied, 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976). Additionally, the injury suffered must have been to plaintiff's (or, in this case, counterclaimant's) "competitive position in the business in which he is or was engaged." GAF Corp. v. Circle Floor Co., 463 F.2d 752, 758 (2d Cir. 1972) (emphasis in original), cert. dismissed, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973). However, "[i]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129 (1969); see Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2d Cir. 1970).
The Court finds that Jetco succeeded in proving injury to its competitive position in the tire business caused by Uniroyal's wrongful termination of its dealership. As to the fact of damage, there was no dispute that the steady and substantial increase in Jetco's tire sales during the period from 1970 to 1973 ended abruptly after Uniroyal terminated the Jetco franchise. From 1970 to 1971, the tire sales increased between 11-12%; from 1971 to 1972, between 35-36%; and from 1972 to 1973, between 56-57%. In the year following the termination, Jetco's tire sales increased only between 2-3%, a minimal amount likely attributable to inflation.[4]
Jetco also proved that the monetary loss it suffered was caused by the termination of its Uniroyal dealership. There was evidence that Jetco was forced to turn away customers in 1974 because it did not have Uniroyal tires to sell them. Specifically, Jetco lost the IBM account, from which it derived revenues approximating $500 per year. After loss of the Uniroyal franchise, Jetco expended substantial sums in advertising in order to change its image to that of a dealer of Michelin and General tires. Additionally, Gellar testified that Uniroyal tires have greater public acceptability and yield a greater profit margin to dealers than do these other brands. On the basis of these findings and other evidence produced *357 at trial, the Court concludes that Jetco was competitively injured by Uniroyal's illegal conduct.[5] Accordingly, Jetco is entitled to recover from Uniroyal three times the amount of damages it has suffered.

The Donnelly Act Claim
New York State's antitrust statute, referred to as the Donnelly Act, is contained in the New York General Business Law § 340 et seq. Section 340(1) provides:
Every contract, agreement, arrangement or combination whereby
A monopoly in the conduct of any business, trade or commerce . . . in this state, is or may be established or maintained, or whereby
Competition or the free exercise of any activity in the conduct of any business, trade or commerce . . . in this state is or may be restrained or whereby
For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business, trade or commerce . . . in this state any business, trade or commerce . . . is or may be restrained, is hereby declared to be against public policy, illegal and void.
Subsection 5 of section 340 grants a private right of action to recover damages caused by a violation of the statute.[6]
It is apparent that New York's Donnelly Act proscribes the same kind of conduct prohibited by the federal Sherman Act, and it has so been held. State v. Mobil Oil Corp., 38 N.Y.2d 460, 464, 381 N.Y.S.2d 426, 428, 344 N.E.2d 357-359 (1976).[7] Therefore, the Court's findings and conclusions as to Jetco's Sherman Act claim are equally applicable to its claim under the state statute.

The Robinson-Patman Act Claim
Congress sought to outlaw anti-competitive price discrimination when it enacted the Robinson-Patman Act, 15 U.S.C. § 13. The statute provides in pertinent part:
(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination. . ..
. . . . .
(d) It shall be unlawful for any person engaged in commerce to pay . . . for . . . anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.
(e) It shall be unlawful for any person to discriminate in favor of one purchaser *358 against another purchaser ... of a commodity bought for resale ... by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.
See FTC v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); Guyott Co. v. Texaco, Inc., 261 F.Supp. 942 (D.Conn. 1966) (Timbers, C. J.).
At trial, Uniroyal attempted neither to rebut Jetco's claim of discriminatory discounts, allowances and services, nor to offer a cost justification defense. See 15 U.S.C. § 13(a). Instead, Uniroyal relied solely on its contention that Jetco did not and could not prove antitrust injury causally connected to the discriminatory conduct. Although finding more than adequate proof of Uniroyal's Robinson-Patman violations, the Court nonetheless denies Jetco relief on its discrimination claim for failure to satisfy the "injury" requirement of Clayton Act § 4, 15 U.S.C. § 15.
There was uncontested evidence that Uniroyal violated its own regulations when it granted Intercity a Wholesale Distributors Allowance ["WDA"] on certain lines of tires without first ascertaining that at least 20% of the tires would be and were sold wholesale and by giving the allowance on all such tires rather than solely on the portion sold wholesale. Jetco, which did not have an at least 20% wholesale trade, did not qualify for and was not granted a WDA.
Intercity also improperly received from Uniroyal quantity discounts, including the Volume Bonus and Large Order Discount. The Uniroyal Dealer Discount Schedule on Uniroyal Tires and Tubes (JX-89) permitted the Large Order Discount only "on orders placed for single shipment to a single destination," (JX-89 ¶ 12). Uniroyal, however, combined the purchases of Intercity's Wappingers Falls outlet with those of the Shrub Oaks outlet for the purpose of computing volume discounts even though such orders often involved delivery to more than one location. Both Ginsberg and Sullen stated that Uniroyal always prepaid the freight. Again, Uniroyal's own records reflect its policy of bearing transportation costs only when an order calls for one shipment to one destination. (JX-88; JX-89 ¶ 13). Intercity received further help from Uniroyal in qualifying for quantity discounts when Uniroyal provided free warehousing to Intercity prior to the opening of the Wappingers Falls store. There was finally much evidence concerning discriminatory advertising allowances. Whereas Intercity was granted allowances in excess of the limitations contained in Uniroyal's own regulations (JX-49), Jetco was kept well within the outside limits. (See JX-51, 52, 55, 59).
The foregoing establishes prima facie violations of the Robinson-Patman Act, and Uniroyal has not met its burden of proving that the discriminations are not proscribed. See 15 U.S.C. § 13(b). "But there is no presumption that proscribed discrimination in price [or services] has caused damage to [Jetco]." Sano Petroleum Corp. v. American Oil Co., 187 F.Supp. 345, 353 (E.D.N.Y. 1960). Jetco's failure of proof of this critical element precludes it from entitlement to treble damages under Clayton Act § 4.
There was much legal argument over the effect of cases such as Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), on the continuing viability of the Second Circuit's pronouncement in Enterprise Industries, Inc. v. Texas Co., 240 F.2d 457 (2d Cir.) (Learned Hand, J.), cert. denied, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), that a Section 2(a) claimant must prove actual damage in order to recover under Clayton Act § 4. The court below had calculated damages by subtracting the discriminatory price from that charged plaintiff. The court of appeals found this erroneous and reversed.
Unlike Enterprise Industries, Hanover Shoe was an "overcharge" case, that is, one in which the price paid by the claimant was illegally high in and of itself. Because the *359 plaintiff in such a case was wrongfully overcharged, he may recover the excess paid without regard to whether some other buyer, not overcharged, passed on the savings to his customers. According to Mr. Justice White:
As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower.
392 U.S. at 489, 88 S.Ct. at 2229.
Like Enterprise Industries, this case involves price discrimination, not overcharge.[8] Jetco was not overcharged; rather, Intercity was undercharged. There was nothing illegal about the discounts, allowances and services Uniroyal granted Jetco except in comparison to those it granted Intercity. Therefore, unless Intercity, "by virtue of [its] lower cost, lowered [its] resale price so that [Jetco] either lost sales volume (if [it] did not meet this competition) or lost profits (if [it] did not match the lower resale price)," M. Handler, Changing Trends in Antitrust Doctrine: An Unprecedented Supreme Court Term  1977, 77 Colum.L. Rev. 979, 993 (1977),[9] Jetco did not sustain antitrust injury sufficient to recover damages under Section 4 of the Clayton Act. The Court rejects any notion that damages may be presumed merely from the fact of discrimination. See Dantzler v. Dictograph Products, Inc., 309 F.2d 326 (4th Cir. 1962), cert. denied, 372 U.S. 970, 83 S.Ct. 1097, 10 L.Ed.2d 133 (1963); Kelly v. General Motors Corp., 425 F.Supp. 13, 20 (E.D.Pa.1976); Krieger v. Texaco, Inc., 373 F.Supp. 108, 112-13 (W.D.N.Y.1973). Applicable, instead, is the general rule that recovery under Clayton Act § 4 requires proof of antitrust injury causally related to the particular violation alleged. Perkins v. Standard Oil Co., 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969).
There was no proof at trial that the favors accorded Intercity enabled it to lower its prices and that Jetco lost profits by meeting these reduced prices. Jetco met and beat Intercity's prices as part of the price war it waged with its new competitor. And, Jetco did not show that the sales it gained by meeting Intercity's competition fell short of the profits it lost by lowering its prices. Jetco cannot complain if Intercity generated greater profit by reason of its lower costs so long as Jetco did not lose profits it otherwise would have made.
Nor did Jetco prove diversion of customers to Intercity by virtue of the discrimination. The loss of business in 1974 stemmed from Uniroyal's termination of Jetco's franchise, not from the special treatment accorded Intercity. Thus, the Court's finding that Jetco suffered damage caused by the Sherman Act § 1 violation does not help Jetco sustain its burden on this claim.

The Common Law Claims
Though not the thrust of its contentions at trial, Jetco succeeded in proving *360 that Uniroyal breached its Zeta Charter with Jetco (JX-9) when it granted Intercity's Wappingers Falls outlet an overlapping Charter area. Thus, Uniroyal is liable to Jetco for breach of contract.
To the extent that Jetco's unfair competition claim differs in substance from those already discussed, the Court declines to reach it.

CONCLUSION
Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Jetco is entitled to recover from Uniroyal three times the damages actually suffered by reason of Uniroyal's Sherman Act § 1 violation, 15 U.S.C. § 1. Jetco is entitled to compensatory damages based upon Uniroyal's Donnelly Act violation and breach of contract.
The precise amount of damages due Jetco shall be determined at a hearing before the Honorable Leonard A. Bernikow, United States Magistrate, unless the parties are able to compromise the issue.
The foregoing constitute the findings of fact and conclusions of law of the Court pursuant to Fed.R.Civ.P. 52(a).
SO ORDERED.
NOTES
[1] At the time of trial, Jetco abandoned its claim under Section 2 of the Sherman Act, 15 U.S.C. § 2.
[2] "Blem" tires, or "blems," are first quality tires that have cosmetic defects. Tire companies, such as Uniroyal, sell them to dealers at greatly reduced prices as promotional specials. The dealers are able to pass on the savings to the public while still making a good profit and advertise "blem" specials to attract customers to their stores.
[3] Jetco claims certain offsets to be determined at a later time.
[4] At the close of trial, the Court reserved decision on the admissibility of four documents culled from the New York State Statistical Yearbook for 1977, marked collectively as Plaintiff's Exhibit 71 ("PX"-71), for identification. Subsequently, the parties were notified that these documents would not be considered by the Court.

PX 71-A, entitled "Average annual civilian and labor force employed, and rate of unemployment by standard metropolitan statistical area as defined in 1973," is a tabulation prepared by the New York State Department of Labor and covers the years 1970 through 1975. PX 71-B is an Index of Business Activity, New York State, 1967-1975, compiled by the New York State Department of Commerce. PX 71-C is a document entitled "Area indexes of business activity, New York State," prepared by the New York State Department of Commerce and covering the years 1967 through 1975. PX 71-D identifies the standard metropolitan statistical areas by which the other data are broken down and was offered to show that Poughkeepsie is included within Dutchess County. The Court takes judicial notice of this last fact without the use of plaintiff's exhibit.
PX-71 was offered to counter Jetco's contention that its decline in growth from 1973 to 1974 was caused by the termination of the Uniroyal dealership. Uniroyal hoped to prove, through these documents, that the economic decline suffered by Dutchess County generally was responsible for Jetco's arrested growth rate. Accepting the authenticity of the documents under Federal Rule of Evidence 902(5), the Court nonetheless rules them as inadmissible as not sufficiently probative of the precise issues before the Court, i. e., the economic health of the tire industry in Dutchess County and, more specifically, the causes of Jetco's arrested growth rate during the relevant period.
[5] In this regard, the following comments of the Seventh Circuit are noteworthy:

. . . [W]e are in a day and age in which the value of the nationally advertised franchise is a matter of general recognition. If [plaintiff] were deprived of the dealership (or franchise right) as a result of an illegal conspiracy, some damage would appear to be implicit.
Fontana Aviation, Inc. v. Beech Aircraft Corp., 432 F.2d 1080, 1086 (7th Cir. 1970).
[6] The 1975 amendment to subsection 5, L.1975, c. 333, § 1, eff. July 1, 1975, see McKinney Cum.Supp. 1977-78, permitting the recovery of "three-fold the actual damages sustained," does not apply to this action.
[7] Consequently, according to the New York Court of Appeals, price discrimination per se does not fall within the purview of the Donnelly Act as it has never been considered within the scope of the Sherman Act. Id. at 462-64, 381 N.Y.S.2d at 427-28, 344 N.E.2d at 358-359.
[8] Years earlier, and in a different context, Mr. Justice Cardozo had explained the dissimilarity in meaning and effect between overcharge and discrimination:

Overcharge and discrimination have very different consequences and must be kept distinct in thought. When the rate exacted of a shipper is excessive or unreasonable in and of itself, irrespective of the rate exacted of competitors, there may be recovery of the overcharge without other evidence of loss. . . . But a different measure of recovery is applicable "where a party that has paid only the reasonable rate sues upon a discrimination because some other has paid less." . . . Such a one is not to recover as of course a payment reasonable in amount for a service given and accepted. He is to recover the damages that he has suffered, which may be more than the preference or less, . . . but which, whether more or less, is something to be proved and not presumed. . . The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less.
Interstate Commerce Comm'n v. United States, 289 U.S. 385, 390, 53 S.Ct. 607, 609, 77 L.Ed. 1273 (1933) (citations omitted).
[9] According to Professor Handler, the Supreme Court's decision in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), reaffirms Enterprise Industries' teaching that automatic damages based upon price differential are not recoverable in a Robinson-Patman case. 77 Colum.L.Rev. at 992.