**Ricky HASBROUCK, d/b/a Rick's Texaco, et al., Plaintiffs–Appellees,**

**v.**

**TEXACO, INC., a foreign corporation, Defendant–Appellant.**

No. 85–4225.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 2, 1986.

Decided Oct. 26, 1987.

Amended March 17, 1988.

Robert H. Whaley, Spokane, Wash., and John Ebel, Seattle, Wash., for plaintiffs-appellees.

Randall B. Robinson and Mark D. Litvack, White Plains, N.Y., Ira S. Sacks, Kaye, Scholer, Fierman, Hayes & Handler, New York City, and William Fremming Neilson, Paine, Hamblen, Coffin, Brooke & Miller, Spokane, Wash., for defendant-appellant.

Before SKOPIL, ALARCON and REINHARDT, Circuit Judges.

**ORDER**

The panel has voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc. The full court has been advised that the following amended opinion would be filed. No judge of the court has requested a vote on the suggestion for rehearing en banc. Fed.R.App.P. 35(b). The petition for rehearing is denied and the suggestion for a rehearing en banc is rejected.

The attached amended Opinion is ordered filed.

**AMENDED OPINION**

REINHARDT, Circuit Judge.

Twelve service station owners successfully sued Texaco, Inc., for price discrimination under the federal antitrust laws. Texaco appeals the jury verdict and the district court's denial of its motion for judgment notwithstanding the verdict or, in the alternative, a new trial. We find that each of Texaco's arguments on appeal is without merit and, accordingly, affirm the decision of the district court, 634 F.Supp. 34.

I. *Background*

Ricky Hasbrouck and eleven other plaintiffs were Texaco retail service station dealers in the Spokane area; they purchased gasoline directly from Texaco and resold it at retail under the Texaco trademark.[1] Throughout the relevant time period Texaco also supplied gasoline to John Dompier Oil Company and Gull Oil Company at a price that was at various times between 2.5¢ and 5.75¢ per gallon lower than the price Hasbrouck paid. Dompier and Gull sold the gasoline they purchased from Texaco to independent retail service stations. Dompier sold the gasoline to retailers under the Texaco trademark; Gull marketed it under private brand names. Some of the retail stations supplied by Dompier and Gull were owned and operated by the suppliers' salaried employees.

Hasbrouck filed a complaint in 1976, charging Texaco with illegal price discrimination in violation of section 2(a) of the Clayton Act, 15 U.S.C. § 13(a) (1982),[2] and seeking treble damages under section 4 of that act, 15 U.S.C. § 15(a) (1982).[3] Section 2(a) is commonly referred to as the Robinson–Patman Act. The complaint alleged that Texaco sold gasoline at substantially and unjustifiably lower prices to Dompier

---

1. For convenience, we will hereinafter refer in most instances to the twelve plaintiffs collectively as Hasbrouck.

2. Section 2(a), as amended by the Robinson–Patman Act, ch. 592, § 1, 49 Stat. 1526 (1936), provides in pertinent part:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....
 The appropriate remedy upon proof of a section 2(a) violation is an injunction prohibiting the unlawful price discrimination.

3. Section 4 of the Clayton Act provides: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws ... shall recover threefold the damages by him sustained...."

and Gull, and that this resulted in a lessening of competition. When the matter was tried initially, the jury found that Texaco had engaged in price discrimination in violation of section 2(a) and awarded Hasbrouck $849,484 in damages under section 4. The district court, instead of trebling the damages, granted Texaco's motion for judgment notwithstanding the verdict (j.n.o.v.); the court held that jury instructions regarding the measurement of damages, which were based on *Fowler Manufacturing Co. v. Gorlick*, 415 F.2d 1248 (9th Cir.1969), *cert. denied*, 396 U.S. 1012, 90 S.Ct. 571, 24 L.Ed.2d 503 (1970), were erroneous because *Fowler* was either distinguishable, impliedly overruled or bad law. On appeal, we found that *Fowler* should have been followed at the time of trial and remanded the proceeding back to the district court for a new trial on the issues of liability and damages; we instructed it that the new trial should be conducted in conformity with the Supreme Court's recent analysis of price discrimination damages in *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir.1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

At the second trial, the jury again returned a verdict for Hasbrouck, this time in the amount of $449,900. This verdict was trebled by the court and judgment was entered in the amount of $1,349,700. Once again Texaco moved for a judgment n.o.v. or a new trial, but this time the district court denied the motion, finding that the jury's verdict was not contrary to the weight of the evidence and that Texaco failed to establish adequate grounds for a new trial. *Hasbrouck v. Texaco, Inc.*, 634 F.Supp. 34 (E.D.Wash.1985). Texaco appeals.

## II. *Discussion*

Texaco challenges several jury findings directly; it also bases its appeal from the district court's refusal to grant its motion for j.n.o.v. or a new trial on the alleged errors in those findings. An appellate court reviews a jury verdict only to determine whether it is supported by substantial evidence, that is, such relevant evidence as reasonable minds might accept as adequate to support a conclusion. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1013 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). A refusal to grant j.n.o.v. is proper when the evidence does not compel only one possible conclusion, the one advocated by the losing party. *Peterson v. Kennedy*, 771 F.2d 1244, 1252 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). A denial of a motion for a new trial is reviewed for abuse of discretion. *Robins v. Harum*, 773 F.2d 1004, 1006 (9th Cir.1985).

### A. *Proof of Price Discrimination Under Section 2(a)*

Section 2(a) of the Clayton Act (the Robinson–Patman Act) prohibits the sale of like goods to different purchasers at a different price, where the effect of such price discrimination may be substantially to lessen competition. 15 U.S.C. § 13(a). Texaco challenges the jury's finding of liability under section 2(a) on two grounds, (1) that the admitted price differential was justified, and (2) that, in any event, the differential did not affect competition. We disagree with Texaco on both points. We address each in turn.

1. *Whether the Price Differential Was a Lawful Functional Discount.* Texaco argues that the price break afforded Dompier and Gull was a legitimate wholesale discount. It maintains that, because section 2(a) permits a manufacturer to offer wholesale discounts, the critical inquiry is merely whether the discount was equally available to all wholesalers.

Manufacturers are permitted to use price differentials, commonly known as wholesale or functional discounts, to compensate certain classes of buyers for the distributional services they perform. *See FTC v. Morton Salt Co.*, 334 U.S. 37, 43–44, 68 S.Ct. 822, 826–27, 92 L.Ed. 1196 (1948); 15 U.S.C. § 13(a); 3 E. Kintner & J. Bauer, *Federal Antitrust Law*, §§ 20.14,

22.14 (1983). For this reason, goods may generally be sold to wholesalers at a lower price than that charged to retailers. However, the discount Texaco provided here does not qualify as a functional or wholesale discount. Moreover, Texaco is simply incorrect when it argues that it is absolved from Robinson–Patman liability if it can show that a particular discount was available to all wholesalers.

■ That all wholesalers were offered the same discount would be an appropriate defense in a case where the plaintiff and the other customers of the defendant were all wholesalers performing at the same level in the chain of distribution. Here, however, only the other customers are wholesalers; the plaintiffs are retailers who are further down the chain of distribution. The injury occurs at the latter level and results from the receipt by wholesalers of a functional discount in excess of the value of the services they perform, all or a portion of which they then pass on to the retailers they supply.

As the Supreme Court long ago made clear, and recently reaffirmed, there may be a Robinson–Patman violation even if the favored and disfavored buyers do not compete, so long as the customers of the favored buyer compete with the disfavored buyer or its customers. *Morton Salt*, 334 U.S. at 43–44, 68 S.Ct. at 826–27; *Perkins v. Standard Oil Co.*, 395 U.S. 642, 646–47, 89 S.Ct. 1871, 1873–74, 23 L.Ed.2d 599 (1969); *Falls City Indus., Inc. v. Vanco Beverages, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288–89, 75 L.Ed.2d 174 (1983). Despite the fact that Dompier and Gull, at least in their capacities as wholesalers, did not compete directly with Hasbrouck, a section 2(a) violation may occur if (1) the discount they received was not cost-based and (2) all or a portion of it was passed on by them to customers of theirs who competed with Hasbrouck. *Morton Salt*, 334 U.S. at 43–44, 68 S.Ct. at 827; *Perkins v. Stan-*

*dard Oil*, 395 U.S. at 648–49, 89 S.Ct. at 1874–75; *see* 3 E. Kintner & J. Bauer, *supra*, § 22.14.

■ Hasbrouck presented ample evidence to demonstrate that both conditions were met. The plaintiffs offered evidence that the services performed by Gull and Dompier were insubstantial and did not justify the functional discount. For example, there was evidence that Gull had no bulk plant for temporary storage of gasoline and that its customers received direct deliveries from Texaco. This evidence supports the allegation that Gull's role as a middleman amounted only to engaging in paper transactions. The record also reflects that Texaco delivered gasoline directly to Dompier's customers in some instances. In addition, as the district court put it, Texaco made "no serious attempt" to provide a quantitative justification for its functional discount, instead "merely identifying some of the functions" that Dompier and Gull were said to have performed. 634 F.Supp. at 38.[4] In the face of Hasbrouck's evidence challenging the cost basis of the discount, Texaco's showing was clearly inadequate.

Hasbrouck also presented sufficient evidence to support a finding that the 2.5¢ to 5.75¢ per gallon discount received by Gull and Dompier was passed on, at least in part, to retail competitors of Hasbrouck. There was documentary evidence that some retail stations operated or supplied by Dompier and Gull purchased gasoline at prices lower than those paid by Hasbrouck. There was also extensive testimony that, in order to stay in business, gasoline retailers needed a profit margin in the neighborhood of ten cents per gallon; yet, service stations operated or supplied by Dompier often sold gasoline at retail prices that were only two to three cents higher than the price that Hasbrouck paid to Texaco. This further tends to show that some portion of the discount was passed along. Because

---

**4.** Texaco does not argue that the services its wholesalers generally performed justified the amount of the discount and that, as wholesalers, Dompier and Gull were entitled to that discount whether or not they performed all of the customary wholesaler services. In any event, we express no view as to the merits of such an argument. We mention it only because of the emphasis that Texaco places on the claim that there was no evidence that Dompier and Gull were charged different prices than other wholesalers.

there was sufficient evidence that (1) the discount Texaco afforded Dompier and Gull was not justified by the services those companies performed, and (2) at least a portion of the discount was passed on to Hasbrouck's competitors, the jury could properly have concluded that there was an unlawful price differential.

■ We recognize that, generally, selling at different prices to customers who are at different levels of distribution will not constitute a violation of the Robinson–Patman Act. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 120 (3rd Cir.1980); *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1024 (2nd Cir.1976); 3 E. Kintner & J. Bauer, *supra,* § 22.12, at 298–99. However if the position of the Federal Trade Commission is that charging lower prices to a wholesaler than to a retailer can never support a claim under the Act, *see Matter of Boise Cascade Corp.,* 50 Antitrust & Trade Reg. Rep. (BNA) 335, 336 (FTC Feb. 11, 1986), *rev'd on other grounds,* 837 F.2d 1127 (D.C.Cir.1988), we strongly disagree.

Where, as here, the discount given to a customer higher in the distributive chain is sufficiently substantial and is unrelated to the costs of the customer's function, the seller cannot claim immunity from Robinson-Patman liability. In such situations, the connection between the seller's price discrimination and the adverse effect on competition is obvious and foreseeable, and a plaintiff may assert a cause of action against the seller even though he and the favored customer operate at different market levels. *See Perkins v. Standard Oil Company of California,* 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); *Standard Oil Co. v. FTC,* 173 F.2d 210 (7th Cir.1949), *rev'd on other grounds,* 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951). To hold that price discrimination between a wholesaler and a retailer could *never* violate the Robinson-Patman Act would leave immune from antitrust scrutiny a discriminatory pricing procedure that can effective-

ly serve to harm competition. We think such a result would be contrary to the objectives of the Robinson-Patman Act.

■ 2. *Whether the Price Differential Affected Competition.* Texaco also attacks the finding of section 2(a) liability by arguing that Hasbrouck failed to prove that the price discrimination resulted in injury to competition and instead presented evidence reflecting only injury to themselves as competitors. We disagree. The oft-quoted chestnut distinguishing between protecting competition and protecting competitors [5] has been misconstrued with some regularity by antitrust defendants who appear to argue in all types of antitrust cases that the effect of unlawful conduct on competitors is irrelevant. The purpose of drawing a distinction between harm to competition and harm to competitors is to point out that not all acts that harm competitors harm competition. However, the converse is *not* true. Injury to competition necessarily entails injury to at least some competitors. Competition does not exist in a vacuum; it consists of rivalry among competitors. Clearly, injury to competitors may be probative of harm to competition, although the weight to be attached to such evidence depends on its nature and on the nature of the challenged conduct. The aphorism may not be invoked blindly in response to a showing that competitors have been harmed; otherwise it would often serve to shield unlawful conduct that adversely affects competition.

■ With respect to price discrimination claims, the significance of proof of harm to competitors is particularly clear. Section 2(a) of the Robinson-Patman Act is a prophylactic statute, designed to prevent the occurrence of price discrimination rather than to provide a remedy for its effects. The section is violated upon a showing that "the effect of such discrimination *may* be substantially to lessen competition." 15 U.S.C. § 13(a) (emphasis added); *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.

---

**5.** Evidently, the phrase that the antitrust laws were enacted for "the protection of *competition,* not *competitors*" originated in *Brown Shoe Co.*

*v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original).

2d 442 (1981). The Supreme Court has interpreted this portion of the statute as requiring an antitrust plaintiff to show only "a reasonable possibility that a price differential may harm competition." *Falls City Indus., Inc. v. Vanco Beverages, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288–89, 75 L.Ed.2d 174 (1983) (citing *Corn Prods. Refining Co. v. FTC*, 324 U.S. 726, 742, 65 S.Ct. 961, 969, 89 L.Ed. 1320 (1945)). For price discrimination antitrust claims, since *Morton Salt* it has been permissible to *infer* harm to competition from evidence of harm to competitors. *Morton Salt,* 334 U.S. at 50. The Supreme Court recently reaffirmed *"Morton Salt*'s 'self-evident' inference." *Falls City,* 460 U.S. at 436, 103 S.Ct. at 1289 (quoting *Morton Salt,* 334 U.S. at 46, 50–51, 68 S.Ct. at 830).

> In *Morton Salt* this Court held that, for the purposes of § 2(a), injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time. (citations omitted) In the absence of direct evidence of displaced sales, this inference may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits.

*Falls City,* 460 U.S. at 435, 103 S.Ct. at 1289. Thus, in order for an plaintiff to prove competitive injury under Robinson-Patman, he need only show that a substantial price discrimination existed as between himself and his competitors over a period of time. In fact, Hasbrouck not only offered evidence demonstrating that a substantial price discrimination existed but also other evidence that harm to competition would be the likely result—as well as direct evidence of displaced sales.

 It is undisputed that a price differential existed between the rate Texaco charged Hasbrouck and the rate it charged Dompier and Gull. Furthermore, there was evidence that the price differential was substantial and that it was in effect for several years. There can be little doubt

that Texaco's pricing policy constituted price discrimination that was unlawful unless it could be justified under the Act. However, as discussed above, there was sufficient evidence to permit the jury to find that the price differential did not represent a legitimate functional discount and that all or a portion of the discount received by Dompier and Gull was passed on to Hasbrouck's competitors. On appeal Texaco has not pursued any other possible justification for its pricing policy. Thus, there was sufficient evidence to permit the jury to conclude that competition may have been harmed, i.e., that there was "a reasonable possibility"[6] that a competitive injury had occurred. *See Falls City,* 460 U.S. at 434–35, 103 S.Ct. at 1288.

There was in addition considerable specific evidence supporting the conclusion that Texaco's unwarranted pricing policies adversely affected competition. Several witnesses testified that the retail gasoline market was strongly price sensitive, and that a small price advantage reflected in lower retail prices would generate significant swings in customers and sales. Others testified that the plaintiffs lost customers and sales directly to Dompier and Gull stations, that the customer switches resulted from the differences in retail prices between the stations, and that the plaintiffs would have recovered these lost revenues had they received as little as a two or three cents per gallon discount and been able to reduce their pump prices commensurately. This evidence is probative of the fact that the unwarranted price advantages which some Gull- and Dompier-supplied retailers received had a deleterious effect upon the market.

### B. *Proof of Antitrust Injury Under Section 4*

Texaco also challenges the jury's award of damages under section 4 of the Clayton Act. To recover damages under section 4, a plaintiff must show (1) a violation of the

---

6. The district court in fact instructed the jury that plaintiffs needed to "establish by a preponderance of the evidence that the effect of the discrimination in price ... had the reasonable *probability* of substantially lessening competition, or of injuring or destroying or preventing competition." (emphasis added).

antitrust laws, (2) an actual injury of the type contemplated by the statute that is caused by the violation, and (3) the amount of damages suffered as a result. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 487–89, 97 S.Ct. 690, 696–98, 50 L.Ed.2d 701 (1977). In this section, we address the second requirement.

Texaco contends that Hasbrouck failed to prove that it suffered an actual injury that the antitrust laws were designed to prevent. It also contends that there was no direct causal connection between any such injury and Texaco's unlawful conduct because of the existence of several intervening causes, i.e., the independent pricing decisions by Dompier and Gull, their customers, and the plaintiffs.

■ Under section 2(a), all that is required to establish illegal price discrimination is proof that competitive injury *may* result. Once such a showing is made, the plaintiff is entitled to an injunction preventing defendant from engaging in the anticompetitive conduct. However, in order for a plaintiff to recover damages under section 4 he must make some showing of actual injury and causation. The Supreme Court has described these two requirements collectively as "antitrust injury."

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research[, Inc.]*, 395 U.S. [100,] 125 [89 S.Ct. 1562, 1577–78, 23 L.Ed.2d 129] [ (1969) ].

*Brunswick v. Pueblo Bowl–O–Mat*, 429 U.S. at 489, 97 S.Ct. at 697–98 (emphasis in original); *see J. Truett Payne*, 451 U.S. at 562, 101 S.Ct. at 1927. Here, in order for Hasbrouck to prove actual injury, he must show that he lost sales and profits as a result of Texaco's anticompetitive conduct.

■ With respect to Texaco's assertion that intervening causes broke the chain of causality, we have recognized that *Brunswick* requires a plaintiff to show "more than that it suffered injury causally linked to the antitrust violation; the injury must be shown to have 'flowed' from the wrong.... To be one of several causes is not enough. The injury must be of the type likely to be caused by the defendant's [antitrust violation]." *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir. 1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *see Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697–98. However, *Handgards* does not stand for the proposition that the violation must be the sole cause of the injury. "It is enough that the illegality is shown to be a material cause ... a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." *Zenith Radio v. Hazeltine Research*, 395 U.S. at 114 n. 9, 89 S.Ct. at 1571–72 n. 9. In fact, in *Zenith Radio*, the Court permitted causality to be inferred from circumstantial evidence because the injury involved was "precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause." *Id.* at 125, 89 S.Ct. at 1577. *See Brunswick*, 429 U.S. at 487–89, 97 S.Ct. at 696–98; *Handgards*, 601 F.2d at 997. While a defendant may introduce evidence of alternative causes of the injury, such evidence constitutes only a part of the information the jury may consider in determining whether price discrimination was or was not a material cause. "If there is sufficient evidence in the record to support an inference of causation, the ultimate conclusion as to what the evidence proves is for the jury." *Perkins v. Standard Oil*, 395 U.S. at 648, 89 S.Ct. at 1875.

■ Here, the plaintiffs presented substantial evidence to show that the injuries they suffered were precisely the type that would result from unlawful price discrimination and that they flowed from the anti-competitive conduct. Several of them

testified as to diverted sales and lost profits; there was documentary evidence of increases in Dompier's sales volume over the same time period. Plaintiffs also testified that they would have recouped the lost revenues had they received a price break on their purchases of gasoline from Texaco. In addition, former customers testified that they had switched service stations because of the lower prices charged by stations supplied by Dompier or Gull.[7] We believe, as did the district court, that sufficient evidence was introduced to support the finding that Hasbrouck suffered an antitrust injury and that Texaco's unlawful price discrimination was a material cause of that injury.[8]

### C. *Proof of Damages Under Section 4*

■ Texaco also challenges the jury's damages award contending that Hasbrouck failed to present sufficient proof of the amount of damages. Texaco first argues that the district court improperly allowed the jury to consider the higher price charged Hasbrouck—the overcharge—in its calculation of damages, and that this was an improper measure of damages as a matter of law. Damages resulting from illegal price discrimination may not be measured merely by determining the overcharge to the disfavored buyer, i.e., the excess paid by disfavored buyer for the goods it purchased. *J. Truett Payne*, 451 U.S. at 557, 101 S.Ct. at 1923. In rejecting automatic damages in favor of proof of the actual damages incurred, the Court in *J. Truett Payne* stated that "damages could be awarded on the basis of plaintiff's esti-

mate of sales it could have made absent the violation." *Id.* at 565, 101 S.Ct. at 1929 (citing *Zenith Radio*, 395 U.S. at 123–24, 89 S.Ct. at 1576–77 (damages may be based on "evidence of the decline of prices, profits and values")).

■ There is no evidence that the jury based its damages award on an overcharge theory. In an attempt to estimate lost sales resulting from Texaco's pricing differentials, Hasbrouck's expert presented a market analysis that compared Hasbrouck's actual prices, volume and profits to its estimated amounts had the price discrimination not occurred. The expert arrived at the estimated figures using six economic projections based on different underlying assumptions, some of which assumed that Texaco eliminated the differential by raising its price to Dompier and Gull, while others assumed that Texaco lowered its price to Hasbrouck.

Texaco attempts to characterize these projections as representative of overcharge and undercharge theories, then argues that the jury was impermissibly shown evidence of an overcharge. This argument is not persuasive. None of the projections estimated Hasbrouck's damages by measuring the amount of the overcharge. The various projections simply permitted the jury to compare estimates of damages in different market situations, allowing them to determine what Hasbrouck's sales and profits would have been in the absence of price discrimination. Obviously, such a determination necessarily entails postulating the elimination of the price differential, ei-

---

**7.** Further evidence was submitted to show that Texaco management was fully aware of the existing pricing practices and the negative effect such practices were having on direct supplied retailers. This evidence strengthens the causal connection between Texaco's violations and the damage suffered by Hasbrouck. *See Perkins v. Standard Oil*, 395 U.S. at 649, 89 S.Ct. at 1875.

**8.** We note that, in any event, at least two of the three "intervening causes" referred to by Texaco —the facts that Dompier and Gull made independent pricing decisions, and that their customers did so—are inadequate as a matter of law. In essence, Texaco argues that a defendant may avoid Robinson–Patman liability simply by showing that the recipients of the unlawful dis-

count, or their customers, independently set their resale prices. That view would preclude all Robinson–Patman claims involving secondary and tertiary line injury, since the antitrust laws do not permit sellers to dictate the resale prices charged by their customers. *E.g., California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 102–03, 100 S.Ct. 937, 941–42, 63 L.Ed.2d 233 (1980). Texaco's argument is directly contradicted by a long line of Robinson–Patman cases that have found wholesalers liable for unlawful price discounts passed on to their customers. *E.g., Morton Salt*, 334 U.S. at 37, 68 S.Ct. at 822; *Perkins v. Standard Oil*, 395 U.S. at 642, 89 S.Ct. at 1871; *Falls City*, 460 U.S. at 428, 103 S.Ct. at 1282.

ther by increasing the favored buyer's price, decreasing the disfavored buyer's price, or a combination of the two. *See Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 579–80, 90 L.Ed. 652, *reh'g denied,* 327 U.S. 817, 66 S.Ct. 815, 90 L.Ed. 1040 (1946). In any case, as the trial judge stated in his opinion, any danger that the jury might use the overcharge theory to award automatic damages was offset by his contrary oral admonition and the jury instructions. Hence, the admission into evidence of Hasbrouck's damage projections does not provide grounds for reversal. *See United States v. Gwaltney,* 790 F.2d 1378, 1382 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987).

■ Second, Texaco argues that Hasbrouck's damages theory was speculative and internally inconsistent. The burden of proving damages in an antitrust case is, as a matter of necessity, not "unduly rigorous," because "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne,* 451 U.S. at 565–66, 101 S.Ct. at 1929; *see Zenith Radio,* 395 U.S. at 123–24, 89 S.Ct. at 1576–77; *Bigelow,* 327 U.S. at 264, 66 S.Ct. at 579–80. Accordingly, a plaintiff's burden of proving antitrust damages is "to some extent lightened" once a violation is established, and the jury is allowed to approximate the amount of damages. *J. Truett Payne,* 451 U.S. at 567–68, 101 S.Ct. at 1929–30

In this case, Hasbrouck submitted a market analysis which estimated lost profits six different ways. Such evidence is clearly comparable to that accepted by the Court in *Bigelow,* where the plaintiffs estimated damages by comparing their actual profits to their profits immediately before the violation, and to the profits of a competitor who was not subject to the violation. *See Bigelow,* 327 U.S. at 257–59, 66 S.Ct. at 576–77; *Cf. Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d 575, 582 (5th Cir.1982), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982) (on remand from Supreme Court, damage

award held unsupportable because plaintiff failed to offer any evidence that its retail prices differed from those of its competitors, who allegedly received an unjustified discount). Hasbrouck's evidence was sufficient to support the jury's damage award.

■ Finally, Texaco claims the jury's damages award was excessive because it exceeded the total presented in the Hasbrouck's expert's analysis. We will not disturb an award of damages unless it is clearly unsupported by the evidence. *Chalmers v. City of Los Angeles,* 762 F.2d 753, 760 (9th Cir.1985). An otherwise supportable damage verdict will be affirmed unless it is "grossly excessive" or "shocking to the conscience." *Id.* The award here was substantially equivalent to the amount of damages estimated in Hasbrouck's market analysis and does not appear to be grossly excessive. We, therefore, reject Texaco's argument.

### D. *Adequacy of the Jury Instructions*

■ Texaco claims the jury instructions evidence reversible error on the part of the district court. The trial court has broad discretion in formulating jury instructions and will be reversed only upon a showing of an abuse of discretion. *United States v. Wellington,* 754 F.2d 1457, 1463 (9th Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985). So long as the instructions on each element of the case are adequate to ensure that the jury fully understands the issues, no particular formulation or wording is necessary. *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 726 F.2d 1381, 1398 (9th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). A defendant is entitled to an instruction on a defense theory if it has a basis in the law and in the record. *United States v. Coin,* 753 F.2d 1510, 1511 (9th Cir.1985). The failure to submit a proper jury instruction is a question of law reviewed *de novo, 999 v. C.I.T. Corp.,* 776 F.2d 866, 871 (9th Cir. 1985), but subject to the harmless error rule. *See Coursen v. A.H. Robins Co., Inc.,* 764 F.2d 1329, 1337 (9th Cir.1985).

First, Texaco argues that the jury should have been expressly instructed that actual injury is a prerequisite to recovery of treble antitrust damages. The district court did just that when it instructed the jury that Hasbrouck had the burden of proving by the preponderance of the evidence that he "was injured in his property or business by reason of [price] discrimination."

Second, Texaco asserts that the court failed specifically to instruct the jury that the injury proven must be to competition, and not merely to competitors. In its persistent obfuscation of the competition-competitor point, Texaco blurs the fact that proof of potential injury to competition under section 2(a) must be distinguished from a plaintiff's additional burden of proving actual injury and damages under section 4. Injury to the specific plaintiff is the sine qua non of a section 4 claim, once injury to competition has been established. The challenged instructions correctly addressed this point. Separate instructions properly set forth the plaintiffs' obligations as to both sections 2(a) and 4. There is no need to include a specific instruction differentiating between competition and competitors. Viewed as a whole, the district court's instructions were more than adequate to ensure that the jury understood the issues. *See Los Angeles Memorial Coliseum Comm'n*, 726 F.2d at 1398.

Texaco next contends that the trial judge erred by not expressly instructing the jury as to the distinction between an undercharge and an overcharge theory of discrimination. However, the trial court instructed the jury that it was not permissible to determine the amount of Hasbrouck's damages "merely by determining the price difference between the favored and disfavored buyers and multiplying that figure by the number of gallons involved." This instruction correctly described and rejected the overcharge theory. The fact that the trial judge did not use the exact words requested by Texaco does not support a finding of abuse of discretion. *See*

*Los Angeles Memorial Coliseum Comm'n*, 726 F.2d at 1398.

Finally, Texaco alleges that it was improper for the district court to instruct the jury that each of several factors may be a proximate cause of an injury, and that the court refused a requested instruction on intervening causes. These allegations essentially repeat Texaco's claim that Hasbrouck failed to prove proximate cause because of the remoteness of the injury from the price discrimination. As discussed earlier, an antitrust plaintiff need only show that the violation is a material cause of his injury, not that it is the only cause. *Zenith Radio*, 395 U.S. at 114 n. 9, 125, 89 S.Ct. at 1571 n. 9, 1577–78; *see Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir. 1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). The trial judge correctly stated the law in his proximate cause instruction which specified that the violation must "play a substantial part" in causing the injury. *See Gainsville Utils. Dep't v. Florida Power & Light Co.*, 573 F.2d 292, 304 (5th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). Further, while jury instructions did not mention the phrase "intervening causes," they did specify that the injuries had to be "a direct result or a reasonably probable consequence" of the violation, or put another way, that the damages suffered must be "by reason of the violations of the antitrust laws." *See Handgards*, 601 F.2d at 997. Taken as a whole, the instructions made it clear that damages must "flow" from the violation. Therefore, the district court did not err in refusing the requested instruction.

### E. *Texaco's Allegation of Judicial Bias*

Texaco requests a new trial because of an alleged judicial bias in favor of Hasbrouck. A judge is required to disqualify himself if his impartiality might reasonably be questioned, or if he has a personal bias or prejudice for or against a party. 28 U.S.C. §§ 455(a), 455(b)(1).[9] The bias must

---

9. Recusal is also required for personal bias or prejudice under 28 U.S.C. § 144. This section,

however, requires the timely filing of an affida-

stem from an extrajudicial source and not be based solely on information gained in the course of the proceedings. *In re Beverly Hills Bancorp*, 752 F.2d 1334, 1341 (9th Cir.1984). However, Texaco points to no extrajudicial basis for the alleged bias and in fact offers no evidence that the trial judge acted in less than a wholly impartial manner. Texaco supports its allegations of bias merely by pointing to alleged errors at trial in refusing a request to disqualify jurors, formulating preliminary and final jury instructions, and overruling defense objections. Even if these ruling were erroneous, and we do not suggest that they were, they could not justify a finding of judicial bias. Texaco's claim of judicial bias is wholly without merit.

### III. *Conclusion*

Substantial evidence supports the jury findings regarding Texaco's liability and the award of damages. Furthermore, we find the district court's jury instructions sufficient to ensure that the jury fully understood the issues. Because the evidence permitted the jury reasonably to conclude that Hasbrouck was entitled to a favorable verdict, the district court properly denied Texaco's motion for j.n.o.v. We further find no abuse of discretion in the district court's denial of Texaco's motion for a new trial.

AFFIRMED

vit alleging such bias. Because no affidavit was filed by Texaco, section 144 is not applicable.

Although it is unsettled what timeliness requirements apply to section 455, it is clear that a party must have a legitimate excuse, such as newly discovered evidence, for failure to raise the issue at the trial level. *United States v.*

*Conforte*, 624 F.2d 869, 879–80 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980). In this instance, we assume *arguendo* that Texaco's assertion of judicial bias in its motion for j.n.o.v. was sufficient to preserve the issue for appellate review.