James KERR, Plaintiff-Appellant,

v.

HACKNEY PETROLEUM TENNESSEE, INC. and the H.T. Hackney Company, Defendants-Appellees.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Nov. 10, 1988.

Rehearing Denied Dec. 12, 1988.

Permission to Appeal Denied by Supreme Court July 3, 1989.

J. Terry Holland, Knoxville, for plaintiff-appellant.

W.W. Davis, Jr., Barry K. Maxwell, Knoxville, for defendants-appellees.

## OPINION

CANTRELL, Judge.

A retail gasoline dealer brought this action against his gasoline distributor alleging unlawful price discrimination pursuant to Tenn.Code Ann. § 47–25–623 (1988) and procurement of a breach of contract pursuant to Tenn.Code Ann. § 47–50–109 (1988). At the close of the plaintiff's proof, the chancellor granted the defendants' motion for a directed verdict on both claims. On appeal, the plaintiff assigns error to the chancellor's directed verdict on the price discrimination claim and to the exclusion of certain evidence offered by the plaintiff in support of the price discrimination claim.

Plaintiff-appellant James Kerr owns and operates a gas station in Knoxville. Defendant-appellee Hackney Petroleum Tennessee, Inc., a division of defendant-appellee The H.T. Hackney Company, is a distributor of gasoline products. In June of 1983, a representative of Park Oil Company (Hackney's predecessor) contacted Kerr about switching from Gulf to Amoco products. After some negotiation, the parties started doing business together in August of 1983; a formal contract was signed sometime later.

At the time Kerr started buying Amoco products, he paid the same price as all of Hackney's dealers—the dealer tank wagon price. In January of 1984, Hackney signed a contract to acquire all of Amoco Oil Company's interests in Knoxville service stations. Hackney sold gasoline to the eleven new stations at the direct dealer price, which is usually lower than the dealer tank wagon price. In addition, some stations not acquired by Hackney in its contract with Amoco Oil Company were given the direct dealer price. Other stations paid prices even below the direct dealer price.

In January of 1987, Kerr learned from another Amoco dealer (who received the direct dealer price) that Kerr was paying more for his gas than some other Hackney customers. Kerr discussed the price differences with Hackney Petroleum's president, who indicated his belief that the price differences were permissible. Soon afterward, Kerr filed the present action in the Knox County Chancery Court. He alleged violations of Tenn.Code Ann. § 47–25–623 (unlawful price discrimination) and Tenn. Code Ann. § 47–50–109 (procurement of a breach of contract) and prayed for compensatory and punitive damages.

At trial, Kerr testified that four of Hackney's customers were his direct competitors—Four Way Amoco, Straw Plains Amoco, Hayes Amoco, and Burkhart (Grayson) Amoco. All four stations paid the direct dealer price or lower.

The Straw Plains station is owned by Hackney. John Redwine, vice president of Hackney Petroleum, testified that Hackney employs all the personnel, keeps the books,

sets the prices and hours, and generally controls the operations for Straw Plains. Another witness, David Hayes, testified that he spends approximately five to six hundred dollars per month on gasoline for his business. At the time of trial, Hayes was buying his gas from Straw Plains. He had talked with Kerr about moving his business to Kerr's station, but Kerr said that he was unable to compete with the prices offered at Straw Plains. Hayes indicated that, if Kerr's prices were competitive, he would switch to Kerr's station.

Kerr testified that, on a couple of occasions, he had seen his customers at Burkhart Amoco, which is 2.7 miles from Kerr's station. Kerr had no information as to why those customers were buying gas at Burkhart's station.

Of the four stations, Hayes Amoco (owned by Steve Hayes) was Kerr's closest competitor: Hayes's station is 400 yards from Kerr's station. (Burkhart's station is the next closest of the four competitors.) Hayes paid the direct dealer price; during the time period in question, the difference between the direct dealer price and the tank wagon price was as much as eighteen cents per gallon. Nevertheless, Hayes's pump prices were higher than Kerr's pump prices. Hayes usually sold approximately five to seven thousand gallons per month; Kerr sold approximately fifteen to eighteen thousand gallons per month. Kerr testified that, based on the information he knew, Hayes was making more money per gallon than Kerr.

The evidence shows that, from 1983 through 1986, Kerr sold more gas, but his profits did not increase after 1984. Thus, in 1983 (before the price differences began), Kerr sold approximately 130,000 gallons and made a gross profit of $24,545. In 1984, Kerr made a gross profit of $30,-218 on sales of approximately 160,000 gallons. In 1985, he made $29,752 on sales of almost 180,000 gallons; and, in 1986, he made $28,268 on sales of almost 200,000 gallons. During some periods of time, Kerr was selling regular gas at cost. Kerr's accountant testified that Kerr's pool margin (gross profit per gallon sold) was less than that of other Knoxville Amoco dealers; the accountant only provided the actual figures for one dealer, Mr. Roach, who received the direct dealer price.

The possible impact of market factors was brought out at trial. For a period of time when Kerr was a Gulf dealer, gasoline allocation put a limit on his sales. Between 1983 and 1986, when Kerr's sales were increasing, deregulation caused gas prices to go down and sales to go up.

As a measure of his alleged damages, Kerr calculated the difference between the price he paid for his gas and the prices paid by Hayes, Four Way, and Straw Plains. Based on this difference and the number of gallons he had purchased from Hackney, Kerr came up with a figure of approximately $64,000 in damages.

During the course of the trial, counsel for Kerr attempted to introduce into evidence a copy of a memorandum opinion in a case decided in Knox County Chancery Court which was alleged to be similar to the present case and also sought to introduce evidence of defendants' financial condition. Counsel for Kerr argued that these two sets of evidence were relevant to the issue of punitive damages. The chancellor refused to admit any of this evidence.

At the close of plaintiff's proof, defendants' counsel moved for a directed verdict and indicated that the defendants would not offer any proof should the court decide to let the case go to the jury. The court granted the motion for a directed verdict as to both claims.

Plaintiff filed this appeal on the price discrimination claim.

### Private right of action

■ We first address the issue of whether Tenn.Code Ann. § 47–25–623 creates a private right of action. Kerr seeks to recover damages for unlawful price discrimination. Although § 47–25–623 makes certain pricing practices unlawful, it does not include any provision creating a remedy for its violation.

Much of the language of Tenn.Code Ann. § 47–25–623(a)(1) tracks that of § 2(a) of

the Clayton Act, as amended by the Robinson–Patman Price Discrimination Act, 15 U.S.C. § 13(a) (1982) (hereinafter referred to as § 2(a)). Section 2(a) provides for injunctive relief. *See* 15 U.S.C. § 13(a). Section 4 of the Clayton Act, as amended, 15 U.S.C. § 15 (1982) (hereinafter referred to as § 4), provides for treble damages. Tenn.Code Ann. § 47–25–623 has no provision comparable to § 4 (and does not provide for injunctive relief).

Despite the absence of an express provision for damages as found in the federal statutory framework, a private right of action can be inferred from the purpose for which the Tennessee legislature enacted Tenn.Code Ann. § 47–25–623. Section 47–25–623 is part of the Petroleum Trade Practices Act, Tenn.Code Ann. § 47–25–601 *et seq.* The central purpose of the Petroleum Trade Practices Act is set forth in Tenn. Code Ann. § 47–25–603(a):

> The purpose of this part is to regulate vertical integration of the petroleum industry in Tennessee, it being the conclusion of the general assembly hereby expressed that vertical integration tends to operate in restraint of free trade and inhibits full and free competition and therefore tends to increase the price of petroleum....

Since this statement of legislative intent seems to embody a desire to protect members of the petroleum industry from unfair competition, this court can conclude that the legislature intended to give rise to a private cause of action for violations of Tenn.Code Ann. § 47–25–623.

### *Proper standard for price discrimination action*

■ What elements must a plaintiff prove to make out a prima facie case for recovery under Tenn.Code Ann. § 47–25–623? The pertinent statutory language provides:

> It is unlawful for any refiner, distributor, or producer of petroleum products engaged in business in this state, either directly or indirectly, to discriminate in prices between purchasers for petroleum products of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such petroleum products are sold for use, consumption, or resale within the state of Tennessee, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

Tenn.Code Ann. § 47–25–623(a)(1). Obviously, the statute requires that a transaction meet certain preliminary qualifications before the statutory prohibition will apply—for example, one of the purchases must be in commerce. (The parties stipulated most of the preliminary requirements.) Assuming that the statutory prohibition applies, what must a plaintiff prove to show that he is entitled to damages? This question represents a central dispute between the parties in the present case.

Tenn.Code Ann. § 47–25–623(a)(1) prohibits price discrimination "where the effect of such discrimination may be substantially to lessen competition...." This language is identical to language in § 2(a) of the Clayton Act, as amended by the Robinson–Patman Price Discrimination Act, 15 U.S.C. § 13(a). Thus, argues Kerr, this court should interpret § 47–25–623(a)(1) in the same way as the federal courts have interpreted § 2(a).

Section 2(a) makes certain price discrimination unlawful and authorizes injunctive relief. 15 U.S.C. § 13(a). The section has been held not to require a showing of actual injury to competition; rather, a plaintiff need only show a reasonable possibility that the price discrimination may harm competition. *F.T.C. v. Morton Salt Co.,* 334 U.S. 37, 46, 68 S.Ct. 822, 828, 92 L.Ed. 1196 (1948). Moreover, this reasonable possibility of harm to competition (often called "competitive injury") can be inferred from substantial price discrimination over a period of time. *Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 435, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983). Thus, the courts have interpreted § 2(a) to

allow injunctive relief upon a showing of substantial price discrimination over a period of time. *See id.* Kerr argues that the same interpretation should apply to Tenn. Code Ann. § 47–25–623(a)(1).

Hackney argues that this court should follow the line of authority interpreting the treble damages provision, § 4 of the Clayton Act, 15 U.S.C. § 15. Under these cases, a plaintiff seeking treble damages "must show (1) a violation of the antitrust laws [here, price discrimination], (2) an actual injury of the type contemplated by the statute that is caused by the violation, and (3) the amount of damages suffered as a result." *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1041–1042 (9th Cir.1987), *petition for cert. filed,* June 14, 1988; *see also J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 561–562, 101 S.Ct. 1923, 1926–1927, 68 L.Ed.2d 442 (1981).

In sum, Kerr proposes that a plaintiff be allowed to recover under Tenn.Code Ann. § 47–25–623 without a showing of actual injury; substantial price discrimination over a period of time would make harm to competition sufficiently likely. Hackney argues that a plaintiff should not be able to collect damages without proving that he has been injured and how much.

Kerr emphasizes the fact that the language of Tenn.Code Ann. § 47–25–623(a) is the same as language found in § 2(a) of the Clayton Act, as amended by the Robinson–Patman Price Discrimination Act, 15 U.S.C. § 13(a), which has been interpreted by the federal courts not to require a showing of actual injury. *See Morton Salt,* 334 U.S. at 46, 68 S.Ct. at 828. However, § 2(a) only deals with injunctive relief, which is designed to prevent possible harm. The Clayton Act, as amended by the Robinson–Patman Price Discrimination Act, should be viewed as a cohesive statutory framework. The federal courts have interpreted § 4 of the Clayton Act, 15 U.S.C. § 15, to require an individual to show that he has been injured in order to collect damages. *See J. Truett Payne,* 451 U.S. at 561–562, 101 S.Ct. at 1926–1927. The same rule should apply in Tennessee: a person should not be able to collect damages without showing that he has been harmed. A comprehensive, rather than a selective, application of the federal authorities supports this result.

*Propriety of directed verdict*

In reviewing the grant of a directed verdict, an appellate court "must take the strongest legitimate view of the evidence in favor of the plaintiff," indulge "all reasonable inferences in his favor," and disregard "any evidence to the contrary." *Cecil v. Hardin,* 575 S.W.2d 268, 270 (Tenn.1978). If, under that standard, there is "no material evidence in the record that would support a verdict" in favor of the plaintiff, the directed verdict should be sustained. *Id.*

In the present case, this court must determine whether Kerr presented evidence to support his claim for damages for unlawful price discrimination pursuant to Tenn.Code Ann. § 47–25–623. As discussed above, this claim requires Kerr to show (1) price discrimination, (2) injury, and (3) damages. *See Hasbrouck v. Texaco,* 842 F.2d at 1041–1042. The evidence of price discrimination is clear, as the court below found. Thus, this court must focus on the available evidence as to the remaining two issues—injury and damages.

In evaluating whether there is any evidence to support Kerr's claim, the court is limited to examining the competitive relationship between Kerr and Hayes Amoco. As to the Four Way and Burkhart stations, Kerr has presented no evidence of harm to his ability to compete. Kerr's observation of some of his customers at Burkhart's station is irrelevant absent some evidence that Hackney's price discrimination caused them to switch stations. As to the Straw Plains station, the evidence shows that Straw Plains is wholly owned and controlled by Hackney. The Sixth Circuit has held that transfers of gasoline between a company and a station under the complete control of that company do not qualify as sales under the Clayton Act. *Shavrnoch v. Clark Oil and Refining Corp.,* 726 F.2d 291, 295 (6th Cir.1984). The recent Tennessee legislation cited by Kerr (Act effective July 1, 1988, ch. 1033, 1988 Tenn.Pub.Acts

488) does not affect this decision because it only took effect in July of 1988.

■ *Injury.* Following the reasoning of the federal authority interpreting § 4 of the Clayton Act, this court holds that a plaintiff seeking damages pursuant to Tenn.Code Ann. § 47-25-623 must prove that he has been injured as a result of the defendant's violation of the statute. The United States Supreme Court has referred to the requirements of actual injury and causation as "antitrust injury":

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Brunswick v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In other words, did the price discrimination harm the plaintiff's ability to compete with a favored competitor? *See World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1480 (10th Cir.1985), *cert. denied,* 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985).

Although the federal cases do not offer absolute rules as to what facts will or will not constitute antitrust injury, courts seem to view the lowering of prices by a favored competitor as an important factor. *See, e.g., Hasbrouck v. Texaco,* 842 F.2d at 1043; *World of Sleep,* 756 F.2d at 1480. If a favored competitor was able to lower its prices due to its lower cost, the disfavored competitor can show its injury in one of two ways: (1) the disfavored competitor lowered its prices to compete with the favored competitor and therefore lost profits, or (2) the disfavored competitor lost sales (and therefore profits) due to the favored competitor's lower prices. *See World of Sleep,* 756 F.2d at 1480; *Uniroyal, Inc. v. Jetco Auto Serv., Inc.,* 461 F.Supp. 350, 359 (S.D.N.Y.1978).

In *J. Truett Payne,* the United States Supreme Court found it unnecessary to decide whether lowering of prices by a favored competitor is a prerequisite to the recovery of damages. 451 U.S. at 564-565, n. 4, 101 S.Ct. at 1928-1929, n. 4. However, the Court observed that the failure to show a lowering of prices makes a plaintiff's case "particularly weak." *Id.* In the *Uniroyal* case, a federal district court denied recovery in the absence of a showing of lowering of prices:

> Jetco [the disfavored competitor] cannot complain if Intercity [the favored competitor] generated greater profit by reason of its lower costs so long as Jetco did not lose profits it otherwise would have made.

*Uniroyal,* 461 F.Supp. at 359. Stated another way, a disfavored competitor should not recover if he does not "even claim that the alleged favored purchaser or purchasers did anything more with the purported price advantage than put it in their pockets." *McCaskill v. Texaco, Inc.,* 351 F.Supp. 1332, 1341 (S.D.Ala.1972), *aff'd sub nom. Harrelson v. Texaco,* 486 F.2d 1400 (5th Cir.1973).

The emphasis on lower sales prices seems to stem from the nature of the price discrimination prohibition. Price discrimination means that the favored party got a preference, not that the disfavored party paid an unreasonable price; the latter situation would constitute an overcharge. *See Interstate Commerce Comm'n v. United States ex rel. Campbell,* 289 U.S. 385, 390, 53 S.Ct. 607, 609, 77 L.Ed. 1273 (1933). Thus, in another context, Justice Cardozo summarized the essence of the price discrimination analysis as follows: "The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less." *Id.* Arguably, if the favored party did not lower its prices, the disfavored party suffered no antitrust injury.

In *J. Truett Payne,* 451 U.S. at 557, 101 S.Ct. at 1923, the plaintiff went out of business. He testified that, according to his salesmen and customers, he was being undersold by competitors. The plaintiff introduced evidence of a decline in market share, a decrease in average gross profits on used car sales (but an increase in gross

profits on new car sales), and an expert opinion that the alleged price discrimination caused area prices to remain higher than they otherwise would have been. There was no evidence of lowered prices by the favored competitors. *Id.* at 563–564, 101 S.Ct. at 1927–1928. The court found it unnecessary to rule on the injury issue because the court of appeals had not determined whether there had even been a Robinson–Patman violation. *Id.* at 568, 101 S.Ct. at 1930. However, before remanding, the Supreme Court characterized the evidence as weak and compared it to the more substantial evidence presented in two other cases, *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), and *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), *reh'g denied*, 327 U.S. 817, 66 S.Ct. 815, 90 L.Ed. 1040 (1946), where the court found antitrust injury:

> In *Zenith*, for example, plaintiff compared its sales in Canada, where it was subject to a violation, with its sales in the United States, where it was not. And in *Bigelow*, plaintiff adduced evidence not only comparing its profits with a competitor not subject to the violation but also comparing its profits during the time of the violation with the period immediately preceding the violation.

*J. Truett Payne*, 451 U.S. at 567, 101 S.Ct. at 1929.

On remand, the Fifth Circuit addressed the injury issue and stated that, to avoid a directed verdict, a "plaintiff must put forth substantial evidence." *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575, 582 (5th Cir.1982), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). The court rejected the plaintiff's testimony of underselling and the expert testimony because neither witness "testified from the basis of actual sales experience or comparative sales pricing." *Id.* at 581. The Fifth Circuit concluded that the plaintiff's conclusory statements and the evidence of a slight decrease in the plaintiff's market share were insufficient to show antitrust injury. *Id.* at 581–582.

By contrast, in *Hasbrouck v. Texaco, Inc.*, 842 F.2d at 1034, the court found evidence of diverted sales and lost profits and an increase in a favored competitor's sales volume sufficient to prove antitrust injury. *Id.* at 1043. In that case, customers testified that they switched from the disfavored competitors to customers of the favored competitor because the latter charged lower prices. The court also pointed out the plaintiffs' testimony that, with a price break, they could have regained their losses. *Id.* In light of the nature of the price discrimination prohibition (discussed above), this latter factor does not seem to be an appropriate one for the court's consideration.

As stated above, the overall inquiry is whether the price discrimination impaired the disfavored competitor's ability to compete with those who received the price breaks. *World of Sleep*, 756 F.2d at 1480. Even if the favored competitor did not lower his prices, the disfavored competitor might still be able to prove injury by evidence that the favored competitor used his price break to do more advertising or make more capital expenditures—and that the disfavored competitor suffered as a result. *See id.* In any event, the disfavored competitor must somehow show that he is in a worse position than he would have been absent the favored competitor's price advantage. The disfavored competitor needs to show that the favored competitor "drew either profits or sales" away from him. *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17, 22 (1st Cir.1981).

In the present case, has Kerr offered "substantial evidence" of antitrust injury? Kerr testified that Hayes's pump prices were higher than Kerr's pump prices. Kerr does not contend that Hayes responded to his lowered cost by lowering his pump prices, thereby forcing Kerr to lower his pump prices and lose profits. There is no evidence of diverted sales. The only evidence going to injury shows that Kerr's pool margin (gross profit per gallon) declined from 1983 through 1986 and that his gross profits did not increase after 1984, despite his increasing sales. The record does not allow any comparison of Kerr's

profits to those of Hayes, since Hayes's pump prices are not in evidence. The record does not compare Kerr's profits in the years prior to 1983 to his profits during the price discrimination. Most importantly, the record does not show that Hayes's favored status *drew* profits away from Kerr. Kerr has not established that, absent Hayes's preferences, Kerr's profits would have been greater. Rather, Kerr has merely suggested that, due to Hayes's favored status, Hayes has made higher profits than he otherwise would have made.

The crux of Kerr's argument seems to be that, if he had gotten the reduced cost, he would have made more profits. Because Hayes received a preference, argues Kerr, he was able to make more money. Higher profits make a business stronger and allow one more flexibility to respond to the competition. However, increased profits alone do not prove antitrust injury. *See, e.g., Uniroyal,* 461 F.Supp. at 359. Therefore, we conclude that Kerr has not established antitrust injury.

■ *Damages.* Even assuming that Kerr has established antitrust injury, Kerr has not established a reasonable approximation of his damages. Kerr's estimate of $64,000 in damages represents the amount of the price discrimination. In *J. Truett Payne,* the Supreme Court rejected the automatic damages theory. 451 U.S. at 561–562, 101 S.Ct. at 1926–1927. Kerr has offered no other evidence upon which a jury could determine a damages award.

Since Kerr has not established a right to recover under Tenn.Code Ann. § 47–25–623, we will not address his arguments on the exclusion of evidence offered on the issue of punitive damages.

We affirm the lower court's action in directing a verdict in favor of the defendants. Tax the costs on appeal to the appellant.

SANDERS, P.J., and WILLIAM H. INMAN, Special Judge, concur.